**Diana L. MASON, Individually and as Administrator of the Estate of Otis W. Mason, Plaintiff,**

v.

**TEXACO, INC., Defendant.**

**Civ. A. No. 78–1337.**

United States District Court,
D. Kansas.

July 6, 1990.

notwithstanding the verdict, or alternatively, for a new trial. After the reversal and remand by the Tenth Circuit, 862 F.2d 242, the second trial in this case commenced on September 27, 1989 and lasted through closing arguments on January 3, 1990. The jury returned a verdict for plaintiff, finding defendant 100% liable for compensatory damages totaling $9,025,000 and punitive damages in the amount of $25,000,-000.

Although the facts of this case have been reported in the Tenth Circuit's remand order and in a Kansas Supreme Court opinion upon certified question, *Mason v. Gerin Corp.*, 231 Kan. 718, 647 P.2d 1340 (1982), the court provides a brief background here. In September, 1977 Otis Mason was diagnosed with acute myelocytic leukemia while serving in the United States Coast Guard at Yorktown, Virginia. In an attempt to ascertain the cause of Mason's leukemia, his treating and diagnosing physician learned that Mason had possibly been exposed to the chemical benzene while instructing students in the use of a motor oil test kit. Mason filed suit in 1978 against the immediate supplier of the test kit, alleging, *inter alia,* failure to warn of the carcinogenic danger of benzene. Otis Mason died from leukemia on December 10, 1979, and his widow Diana was substituted as plaintiff in the survival action. By two amended complaints filed in 1980, Mason added various other distributors and two manufacturers of the product, including Texaco, Inc. At this second trial, only Texaco remains as a named defendant.

Defendant raises a number of factual and procedural challenges that are claimed to require a judgment notwithstanding the verdict or a new trial. It is well settled that the "district court has broad discretion in deciding whether to grant a motion for a new trial." *Patty Precision Prods. Co. v. Brown & Sharpe Mfg.*, 846 F.2d 1247, 1251 (10th Cir.1988); *Royal College Shop v. Northern Ins. Co. of New York*, 895 F.2d 670, 677 (10th Cir.1990). In reviewing a motion for judgment notwithstanding a

## OPINION AND ORDER DENYING DEFENDANT'S POST TRIAL MOTION

THEIS, District Judge.

This matter is before the court on the motion of defendant Texaco for judgment

verdict, the court applies the same standard governing directed verdicts. *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 498 (10th Cir.1984). It is not the function of the court to weigh the evidence or make credibility determinations. *Id.* at 499. Rather, "the trial court must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences." *Id.* at 498. Thus, the court may grant a JNOV motion "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1180 (10th Cir.1989).

The court will first address those issues raised by defendant which, if meritorious, would entitle it to a grant of JNOV, and will then address the procedural challenges going to the propriety of a new trial.

### I. *Causation in Fact*

#### A. Cause of Leukemia

■ As a threshold question, the special verdict form asked the jury to determine whether Mason's leukemia had been caused by exposure to benzene. Defendant challenges the jury's affirmative answer on this issue, arguing that Mason's exposures to benzene and his clinical diagnosis by the treating physicians did not support an inference of causation.

The court would be able to accept defendant's contentions only by ignoring the testimony both of Mason's treating physicians and of the expert epidemiologists called by plaintiff. Basing their opinions largely on the dose and duration of dose of benzene to which Mason had been exposed while at Yorktown, these witnesses concluded that Mason's leukemia had been caused by benzene. Because no clinical test can directly and conclusively establish a link between a given case of leukemia and benzene, Mason's medical diagnosis provided only limited evidence of benzene-induced leukemia. However, Dr. Reid—the Coast Guard physician who first diagnosed Mason's leu-

kemia—testified that acute myelocytic leukemia is one of the most common forms of leukemia associated with benzene, and that this fact aided his swift identification of the causative agent in Mason's case. Tr. Vol. 6, at 513.[1]

The court is unaware of any authority that would authorize it to reject out of hand the opinions of Mason's treating physicians and of plaintiff's experts. As a basis for rejecting the conclusions of these witnesses, defendant refers the court only to the contrary interpretation of the evidence given by defendant's experts. The proper deference to be given the jury's resolution of these conflicting opinions, however, was aptly stated by the court in *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984):

> Judges, both trial and appellate, have no special competence to resolve the complex and refractory causal issues raised by the attempt to link low-level exposure to toxic chemicals with human disease. On questions such as these, which stand at the frontier of current medical and epidemiological inquiry, if experts are willing to testify that such a link exists, it is for the jury to decide whether to credit such testimony.

*Id.* at 1554; *see also Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1155 (10th Cir.1990) (jury alone has the power to weigh and assess credibility of expert testimony on causation and judges will not retry facts); *Graham v. Wyeth Laboratories*, 906 F.2d 1399, 1404 (10th Cir.1990); *McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 834–35 (7th Cir.1985). It must also be borne in mind that the jury's finding, and this court's review, is governed by a standard of legal sufficiency, rather than scientific certainty. *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986). Considering the substantial expert testimony based upon the evidence, the court finds defen-

---

**1.** As a result of Dr. Reid's efforts to identify the cause of Mason's leukemia, the Coast Guard discontinued its use of benzene shortly after Mason was diagnosed.

dant's argument to be meritless. Defendant had ample opportunity to develop its own experts' testimony and to test the conclusions of plaintiff's witnesses through cross examination. The jury's finding will not be disturbed.

### B. Exposure to Texaco's Benzene

■ Defendant also challenges the jury's finding that the benzene causing Mason's leukemia was manufactured by Texaco. In a civil case such as this, product identification need only be proven by a preponderance of the evidence. *McMahon*, 774 F.2d at 834. Additionally, under Kansas law, a defendant who seeks to reduce his fault by comparing it to the fault of an absent party has the burden of proving the other party's fault by a preponderance of the evidence. *McGraw v. Sanders Co. Plumbing & Heating*, 233 Kan. 766, 667 P.2d 289, syl. ¶ 7 (1983).[2] The procedural history of this complex factual issue is relevant to the present discussion.

Plaintiff originally sued two manufacturers of benzene whose products could have ultimately found their way to the Coast Guard facility at Yorktown: Texaco, Inc. and Ashland Chemical Company. After the close of the evidence in the first trial, this court determined that there was insufficient evidence to support a finding of

exposure to Ashland's benzene, and the court granted Ashland's motion for a directed verdict. Order filed Dec. 16, 1983 (Dkt. No. 228). Accordingly, the issue of Ashland's comparative fault was not submitted to the jury in the first trial. Although Texaco raised this issue in its appeal, the Tenth Circuit did not review this court's decision, finding that new factual issues might be presented on retrial. 862 F.2d at 245.

Before and during this second trial defendant contended that it had discovered "new" evidence upon which to submit the issue of Ashland's comparative fault to the jury. Although more appropriately described as a new construction of old evidence, this court agreed with defendant and determined that Ashland, as well as a third manufacturer of benzene, should be considered by the jury as phantom defendants. Nonetheless, the jury rejected defendant's arguments and found Ashland and Union Amsco—the third manufacturer—to be zero percent at fault in causing Mason's death. With this background, the court turns to an examination of the facts relevant to defendant's present challenge.

The complex chain of distribution in this case can be summarized best by schematic representation:

It is unnecessary to canvass all the evidence of invoices, purchase orders, and testimony that established the flow of benzene in this distribution scheme. Although some minor disputes exist regarding the source of benzene sold by the Gerin Corporation to the Coast Guard, Texaco's argument focuses on the Coast Guard usage.

Therefore, for purposes of the present motion, and viewing the evidence in a light most favorable to plaintiff, the court deems the following facts to have been established.

1. The Coast Guard at Yorktown purchased solvent for the water and sediment test kit only from the Gerin Corporation.

**2.** The syllabus contained in Kansas Supreme Court decisions is prepared by the authoring

Supreme Court Justice and is cited as authority. Kan.Stat.Ann. §§ 20–111, 20–203, 60–2106(b).

2. The Coast Guard purchased 6 gallons of benzene from Gerin in April 1972, and the benzene used to fill this order was manufactured by Union Amsco.

3. The Coast Guard next purchased 3 gallons of benzene in February 1973 and 4 gallons in September 1973. The benzene used to fill these orders was manufactured by Ashland.

4. The next sale of benzene to the Coast Guard was on April 4, 1974 for 4 gallons, and this benzene had been manufactured by Texaco.[3]

5. The Coast Guard next purchased 5 gallons of Texaco benzene on June 18, 1975.

6. The last two purchases of benzene were 1 gallon in November 1976, and 5 gallons in December 1976. This benzene had been manufactured by Union Amsco.

7. Otis Mason was first exposed to benzene in June 1974 as a student in the water and sediment class.

8. Mason first taught the class in October 1974, and taught a total of 4 times during this year. Over the next three years, Mason taught the class 9 times in 1975, no times in 1976 and once in 1977.

Five further pieces of evidence are relevant in determining the source of the benzene at Yorktown during the relevant times. First, there was testimony that the Coast Guard would not re-order benzene until approximately 1 to 2 gallons remained in stock. Price, Tr. Vol. 16, at 1502–04; Seligman, Tr. Vol. 52, at 6849; Kendle, Tr. Vol. 50, at 5997. Second, evidence was introduced that the rate of usage of benzene at Yorktown was approximately 6 gallons per year (or ½ gallon per month). Third, one witness testified that the Coast Guard had 15 gallons of benzene in stock at one time, although no time frame was given for this observation. Fourth, there was testimony that the Coast Guard would try to use the "oldest" benzene first, i.e., that which had been in stock for the longest period of time. Finally, at the time the Coast Guard discontinued the class in September 1977, 7 gallons of benzene remained unused at Yorktown.

Plaintiff's argument is relatively straightforward. At the time of the first purchase of Texaco benzene on April 4, 1974, the Coast Guard had 1 to 2 gallons of non-Texaco benzene on hand. If the Coast Guard used the oldest solvent first, the residual amount of all non-Texaco benzene would have been gone by the time Mason was first exposed in June of 1974. Therefore, Mason would have been exposed only to Texaco benzene during the 5 classes in 1974 and also throughout the 9 classes of 1975, when only Texaco benzene was purchased. At the time Mason taught the single 1977 course, 6 gallons of Union Amsco benzene had also been purchased and were in stock at Yorktown. However, these 6 gallons were the "newest," and again under the "oldest first rule" would have been among the unused 7 gallons remaining at the time the Coast Guard stopped teaching the class.[4] Interpreting the evidence in this manner compels the

---

3. In its present motion Texaco again submits that the "uncontroverted" testimony of the Gerin representatives establishes this sale to have been filled with toluene rather than Texaco benzene. Notwithstanding the testimony of these witnesses, the purchase order and invoice for this sale call for "benzene." Thus, the testimony of these witnesses, which was given several years after the actual sale, is sufficiently controverted by documentary evidence contemporaneously made with this sale to support the jury's verdict.

4. Although there was "no evidence" that the Coast Guard did not follow a strict order of usage, it is of course possible that Mason could have been exposed to some remaining Ashland benzene in 1974 or Union Amsco benzene in 1977. The evidence of strict usage was limited to testimony that the Coast Guard would try to use the oldest first, but there were no safeguards to ensure that this procedure was always observed. E.g., Tr. Vol. 45, at 5265–66. However, even if the jury were to recognize the possibility of exposure to non-Texaco benzene for failure to adhere to strict usage, it might still find that these single exposures were de minimis and had not contributed as a substantial factor to Mason's leukemia. See Roberson v. Counselman, 235 Kan. 1006, 1012, 686 P.2d 149, 153 (1984) & Instruction No. 8. On the other hand, if the jury found a strict order of usage to be credible, this evidence supports the argument that Mason was exposed only to Texaco benzene.

conclusion that Mason was exposed only to Texaco benzene.

The new construction of the evidence given by defendant is considerably more involved. Rather than proceeding forward from the evidence indicating that the Coast Guard had one gallon of non-Texaco benzene at the time of the April 4 purchase, defendant works backwards from the September 1977 inventory. Defendant emphasizes the evidence that the Coast Guard used benzene at a rate of 6 gallons per year. Applying this constant rate of usage, the "oldest first rule," and working backwards, the Coast Guard would have used 4 gallons of Texaco benzene between January and September of 1977. Thus, Mason would have received one exposure to Texaco benzene during the single 1977 class. Under defendant's interpretation, however, the 14 exposures during 1974 and 1975 were to Union Amsco and Ashland benzene. Relying on a strict adherence to each variable, defendant concludes that the Yorktown facility was "stockpiling" benzene, and that the 1974 and 1975 purchases of Texaco benzene were not used until 1976 and 1977, when Mason taught no classes and one class, respectively.

Here again, defendant's argument rests on the proposition that the jury was required to discount all evidence and reasonable inferences unfavorable to defendant's position. The crux of defendant's argument is that its evidence of a constant rate of usage inescapably leads to the conclusion that the Coast Guard had on hand a large stockpile of benzene at the time of the purchases of Texaco benzene. The court agrees that an unfaltering acceptance of this evidence would indicate that other manufacturers' benzene was in stock during the relevant times. But the evidence of a constant usage rate of 6 gallons

per year is undercut by two considerations. First, the 1977 documents relied upon by defendant emphasize that this rate of usage was only an approximation. Plaintiff's Exh. 139L and 139D. More importantly, defendant's theory of a stockpile is directly contradicted by testimony that the Coast Guard would not restock until its benzene supply was low. This latter evidence, unlike a *post facto* approximation that assumes a constant rate of usage, is particularly persuasive because it is supported by the entirely reasonable inference that the Coast Guard's purchases are the most accurate reflection of its actual usage. As Larry Seligman opined in a written statement made in 1977, any fluctuations in the Coast Guard's actual usage of benzene were "probably based on a varying student load *or the current inventory in stock when it was reordered.*" Plaintiff's Exh. 139D (emphasis added). If the jury accepted this evidence, it could then reasonably reject a constant rate of usage and the manifold inferences made from this. Although defendant's theory is supported by *some* evidence, it falls considerably short of that degree of certainty necessary to disturb the jury's verdict. Indeed, it is small wonder that during the first trial neither the court, nor counsel for plaintiff, nor even *Texaco's* counsel was able to chart the tortuous path only recently excavated from the evidence by defendant. Faced with two conflicting and mutually exclusive interpretations of the evidence, the jury could reasonably find that the Coast Guard used benzene at widely varying rates, and that it would not reorder benzene until its supply was low. Because such a finding necessarily compels the conclusion that Mason was exposed only to Texaco benzene, the determination that only Texaco's benzene caused Mason's leukemia shall stand.[5]

5. Defendant also suggests that even if Mason were exposed to Texaco benzene, there is an equal probability that he was exposed to Ashland's and Union Amsco's benzene, and that plaintiff's evidence of causation therefore fails to preponderate. Dkt. No. 502, at 25. As the foregoing analysis demonstrates, however, there is persuasive evidence that only Texaco benzene was in stock during the latter half of 1974 and the entire year of 1975. Thus, contrary to de-

fendant's assertion, the jury's assessment of fault against only Texaco is not based on mere speculation.

Assuming *arguendo* that the evidence irrefutably established the presence of other manufacturers' benzene at Yorktown during this time, the validity of defendant's argument would still be far from clear. The court doubts whether the Kansas Supreme Court would take a favorable view toward two independent wrongdoers,

## II. *Adequacy of Warning*

During the time period of Mason's exposure, the warning given by Texaco was in the form of a Material Safety Data Sheet ("MSDS"). Under a subheading titled "EFFECTS OF OVEREXPOSURE," this MSDS stated:

High concentrations may cause anethestic [sic] effects; prolonged chronic excessive exposure may damage blood forming organs.

Defendant presents two interrelated arguments challenging the jury's finding of an inadequate warning.

First, Texaco submits that its warning adequately reflected the pre–1976 state of scientific knowledge regarding the carcinogenic hazards of benzene exposure. In 1976 the National Institute of Occupational Safety and Health ("NIOSH"), a governmental research body that advises the Department of Labor, became the first government organization to conclude that benzene is a human carcinogen, and to recommend that workplace exposure to benzene be radically reduced. Defendant contends that because the NIOSH report was not released until 1976, after Mason had received most of his classroom exposures, Texaco's warning conformed to the extant state of scientific knowledge.

■ The duty of a manufacturer is not as facile as defendant would have it. Kansas law imposes a continuous duty to warn, "requiring the manufacturer to keep abreast of the current state of knowledge relevant to its products as gained through research, adverse reaction reports, scientific literature, and other available methods." *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, syl. ¶ 8, *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984). Defendant's argument, however, implies that it was required to give credence only to scientific

studies issued by governmental bodies. The holding of *Wooderson* squarely refutes this suggestion. *See also Jones v. Hittle Serv., Inc.*, 219 Kan. 627, 632, 549 P.2d 1383, 1390 & syl. ¶ 2 (1976) (compliance with governmental standards is evidence of due care, but does not preclude finding negligence or defective product where reasonable to take additional precautions). Thus, in determining the state of art knowledge by which the adequacy of Texaco's 1973 warning is measured, the proper inquiry must focus on all sources of scientific knowledge.

■ Considering the available scientific knowledge linking benzene exposure to leukemia, the court finds ample evidence to support the jury's finding that Texaco either knew or should have known of benzene's carcinogenic properties at the time it issued its 1973 warning. Plaintiff introduced voluminous scientific publications dating back as far as 1928 that had associated benzene exposure to various cancers of the blood. Tr. Vol. 25, at 2446–543. A 1948 study commissioned by the American Petroleum Institute ("API")—a trade organization of which Texaco is a member—examined the state of art knowledge at that time and concluded that there were well-documented cases of leukemia resulting from benzene exposure. Tr. Vol. 25, at 2485–96. By the 1960's, many widely-disseminated scientific publications, including standard american medical journals and textbooks, were reporting the carcinogenic danger of benzene exposure as established through hundreds of individual cases. The literature also indicated that this danger existed even at relatively low concentrations of benzene vapor. Most significantly, Ron Richards, the Texaco industrial hygienist who was responsible for preparing its toxic chemical warnings, candidly admitted his familiarity with much of this infor-

either or both of whom is shown to be responsible for an injury, who then seek to escape liability by blithely arguing a lack of proof as to which of them actually caused the injury. Courts confronted with this situation have regularly created a presumption of causation, thereby shifting the burden of proof to those persons whose tortious acts created the uncertainty in

the first place. *E.g., Menne v. Celotex Corp.*, 861 F.2d 1453 (10th Cir.1988) (Nebraska law). Nonetheless, because the verdict indicates that the jury found only Texaco benzene to have been in stock during the relevant times, it is unnecessary for this court to predict whether Kansas would adopt such an "alternative liability" theory of causation.

mation. Thus, the evidence indicated that Texaco was actually aware of the large body of scientific literature linking benzene exposure to leukemia.

It matters little that Texaco and its experts dispute the conclusions of most of these pre–1973 publications. As the court held in *Wooderson:*

> Where scientific or medical evidence exists tending to show that a certain danger is associated with use of a drug, the manufacturer may not ignore or discount that information in drafting its warning solely because it finds it to be unconvincing.

235 Kan. 387, 681 P.2d 1038 at syl. ¶ 10; *see also id.* at 400, 681 P.2d at 1049 (test is not whether evidence of causation is so clear-cut that manufacturer itself is convinced of causation). The *Wooderson* court went on to state "that the duty of the manufacturer must be commensurate with the seriousness of the danger. The greater the danger, the greater the duty." *Id.* at 417, 681 P.2d at 1062.[6] Obviously, the risk of developing a fatal cancerous blood disease through benzene exposure is a great danger. And by the 1960's, epidemiologic studies indicated that a significant percentage of the population is susceptible to this danger, thus triggering the manufacturer's duty to warn. *See Restatement (Second) of Torts* § 402A comment j (1973). Although there was conflicting expert testimony interpreting the persuasiveness of the various studies, the weight to be given the opinions of these experts was exclusively for the jury. *Wilson*, 893 F.2d at 1155; *Ferebee v. Chevron Chem. Co.*, 552 F.Supp. 1293, 1300 (D.D.C.1982), *aff'd*, 736 F.2d 1529 (D.C.Cir.1984). Given the substantial body of literature on this issue, the jury could properly find a state of scientific knowledge sufficient to require that manu-facturers such as Texaco warn of the carcinogenic dangers of benzene.

Alternatively, Texaco argues that its warning adequately warned of the dangers of benzene. To the contrary, the jury could reasonably find that Texaco's warning was inadequate in several respects.

First, although the words "may damage blood forming organs" suggest *some* type of danger associated with the use of benzene, it is quite doubtful whether this language reasonably conveys the specific carcinogenic danger to which users of benzene are exposed. As set forth in Instruction No. 9a, a warning must be comprehensible to the reasonably prudent person using the product and must convey a fair indication of the *nature* and extent of the product's inherent dangers. *See Wheeler v. John Deere Co.*, 862 F.2d 1404, 1413 (10th Cir. 1988) (Kansas law); *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 819 (10th Cir.1979) (under New Mexico law, user of a product must not only be aware of some risk, but the nature and degree of risk must be appreciated). Defendant cannot seriously argue as a matter of law that the language "may damage blood forming organs" reasonably indicates the nature of the danger at issue in this case. In fact, the proximity of this language with the warning of "anesthetic effects" might easily lead the user to conclude that damage to the blood forming organs does not differ significantly in kind from benzene intoxication.[7] Texaco's warning conveys the true nature of the danger to which Mason succumbed only to those readers who understand that the bone marrow is the primary "blood forming organ" in adults; who further understand that the genesis of leukemia is in the cells of the bone marrow; and who further understand that "damage" in this case refers to a cellular damage consisting of an alteration in the molecular structure (or a

---

6. Although the specific language of this holding refers to drug manufacturers, defendant has never suggested that the *Wooderson* decision does not also apply to manufacturers of toxic chemicals such as benzene. However, defendant does attempt to qualify the duty announced in *Wooderson* as applied to the particular facts of this case. *See supra* at section V.B.

7. Benzene intoxication refers to an immediate and potentially fatal acute poisoning that results from a sustained exposure to benzene at excessively high concentrations. Doolan, Tr. Vol. 10, at 943; Wagoner, Tr. Vol. 25, at 2487–88. *See generally Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457 (5th Cir.1976).

disruption in the replication of this structure) of the genetic material of bone marrow cells in their incipient, undifferentiated stage of development—thus leading to the development of cancerous cells. Irons, Tr. Vol. 48, at 5530–95. The court is confident that such information is beyond the ken of almost anyone lacking an advanced education in the medical as well as molecular-biological sciences, and based on the evidence introduced by plaintiff the jury could properly reach the same conclusion.[8]

Second, the jury could reasonably find Texaco's warning inadequate with respect to the *extent* of the danger posed by benzene exposure. *See Long v. Deere & Co.*, 238 Kan. 766, 772–73, 715 P.2d 1023, 1028–29 (1986) (no showing that user appreciated extent of harm). Several of plaintiff's witnesses testified that the word "may" was misleading, insofar as the scientific literature recognized the benzene-leukemia association to have been conclusively established at the time Texaco issued its warning. Moreover, "damage" to an organ may suggest that the injury is something which can be repaired or treated, or which may even heal itself with time. The full extent of the danger resulting from benzene exposure is not mere "damage" to an organ: it is inevitable death. In summary, the jury could reasonably find defendant's MSDS to have been so inadequate as to have been virtually no warning at all, and the court will not disturb this determination.

## III. Superseding Causes

■■■ Defendant alleges that actions of others in the chain of distribution were, as a matter of law, intervening and superseding causes of Mason's exposure to Texaco's benzene. Issues of negligence, contributory negligence and proximate cause are all determined by the jury. *Schmeck v.*

*City of Shawnee*, 232 Kan. 11, 27, 651 P.2d 585 (1982). "Although usually the issue of proximate cause is a question of fact for the jury, it becomes a question of law when all evidence relied upon by a party is undisputed and susceptible of only one inference." *St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043, 1047 (1989) (citation omitted). However, when the critical facts are in dispute, the issue of superseding causes is a matter for the jury to determine, and a decision as a matter of law is inappropriate. *Prince v. Leesona Corp.*, 720 F.2d 1166, 1169 (10th Cir.1983). Questions regarding the existence of intervening and superseding causes are determined according to the test of foreseeability. *Schmeck*, 232 Kan. 11, 651 P.2d 585, syl. ¶ 6. Thus, "[i]f the original actor should have reasonably foreseen and anticipated the intervening act causing injury in the light of the attendant circumstances, his act of negligence would be a proximate cause of the injury." *George v. Breising*, 206 Kan. 221, 227, 477 P.2d 983 (1970). Giving due regard to the jury's findings in these matters, the court turns to the specific issues raised by defendant.

### A. The Coast Guard

■■■ Defendant contends that the Coast Guard knew of the dangers of benzene prior to and during the time Mason started working at the Yorktown facility. Defendant argues that this putative knowledge was a superseding cause of Mason's death, or at least required the jury to assess some degree of fault to the Coast Guard.

Ordinarily, a manufacturer has no duty to warn against dangers that are known or should be known by the user. *Long*, 238 Kan. at 772–73, 715 P.2d at 1028–29; *Mays v. Ciba–Geigy Corp.*, 233 Kan. 38, 58–60,

---

**8.** The court emphasized the jury's exclusive province on this issue in Instruction No. 12: The only danger of benzene with which this case is concerned is its carcinogenic danger, which is referred to as "carcinogenic propensities" throughout these instructions. "Carcinogenic propensities" means, in essense [sic], having a tendency to cause a cancerous effect, and in this case specifically means leukemia. However, when the Court refers to the "car-

cinogenic propensities" of benzene in these instructions, this in no way implies that Texaco was necessarily required to include the words "cancer" or "leukemia" in its warning. You are the sole judges of the adequacy of Texaco's warning, and you may either reject or accept defendant's contention that the warning it gave was adequate to warn of danger of benzene involved in this case.

661 P.2d 348 (1983). If a user is already familiar with the dangerous properties of a product, any additional warning would be superfluous, and the manufacturer's failure to warn could not be a cause of any injuries resulting from use of the product. *See Hall v. Ashland Oil Co.*, 625 F.Supp. 1515, 1520–21 (D.Conn.1986) (degree of benzene user's knowledge of specific risk was issue of disputed fact for the jury); *Menna v. Johns–Manville Corp.*, 585 F.Supp. 1178, 1184–87 (D.N.J.1984) (under both strict liability and negligence claims, level of employer's knowledge or sophistication presents question of fact regarding superseding cause of injury), *aff'd,* 772 F.2d 895 (3d Cir.1985). In support of its claim that the Coast Guard had actual knowledge of benzene's dangerous nature, Texaco relies primarily on information contained in the Coast Guard safety manual and on the testimony Kenneth Doolan—the Coast Guard's manager of industrial hygiene during the relevant times.

The Coast Guard safety manual in effect as of November 1973 listed benzene as a "toxic hazard" that could cause injury to blood forming organs. Nowhere in this manual, however, is benzene clearly identified as a cancer or leukemia inducing agent. At most, this manual demonstrates that somewhere within the annals of Coast Guard safety literature there existed information similar to that contained in Texaco's warning. Defendant produced no evidence that anyone in the Coast Guard's safety program or at the Yorktown facility understood this language to mean that exposure to benzene could cause cancer.[9] The Kansas Supreme Court has made abundantly clear that a manufacturer may not escape liability for failure to warn simply because a user has some general knowledge of a product's inherent dangers. *Long,* 238 Kan. at 772–73, 715 P.2d at 1028–29 (al-

though user knew the reasons and purposes for seat belts, no showing that user appreciated or knew of extreme danger); *see also White v. W.G.M. Safety Corp.,* 707 F.Supp. 544, 549 (S.D.Ga.1988) (knowledge that breathing dust was generally bad does not bar recovery for failure to warn of specific danger of silicosis from breathing sand). Standing alone, this evidence is insufficient to establish that degree of actual knowledge necessary to break the causal connection between Texaco's inadequate warning and Mason's exposure to benzene.

Nor was there any evidence that Mr. Doolan or anyone else responsible for the Coast Guard's safety program was otherwise aware of the carcinogenic properties of benzene. Defendant attempts to rely on Mr. Doolan's membership in the American Conference of Governmental Industrial Hygienists ("ACGIH") as evidence of Coast Guard knowledge. The first ACGIH report to identify benzene as a carcinogen was issued in 1975.[10] This report was in the form of a document that listed numerous hazardous chemicals and the specific dangers associated with each. As defendant elicited during cross examination, however, Mr. Doolan did not purport to know what the ACGIH or similar organizations were reporting at this time. Tr. Vol. 11, at 1004. Moreover, even if Mr. Doolan had been aware of this report, and had further acted instantaneously to bring this information to the attention of the Yorktown facility, it would have been too late to prevent all of Mason's exposures to benzene during 1974 —and possibly many of his exposures during 1975. In short, defendant has failed to show that anyone having responsibility for the safety of Coast Guard personnel knew of benzene's carcinogenic nature prior to and during the time when Mason was exposed to Texaco benzene.

**9.** Mr. Doolan testified that he had a "general picture" as to the various health risks posed by benzene. Tr. Vol. 10, at 942. Conspicuously absent from Doolan's testimony was any specific recognition of the carcinogenic danger of benzene.

**10.** A 1974 report issued by the ACGIH indicated by way of an asterisk that benzene was subject

to notice of an intended change. Mr. Doolan testified that this notice "could have been in response to information that [ACGIH] had on [a] possible carcinogen." Tr. Vol. 11, at 1002. Notwithstanding this testimony, defendant brought out during cross examination of Mr. Doolan that the ACGIH did not clearly identify benzene as a suspect carcinogen until 1975.

Defendant also makes several general allegations that the Coast Guard was a "sophisticated employer," to whom Texaco owed no duty to warn. This argument must also fail. Courts have regularly excused manufacturers from the duty to warn where the purchaser/employer has, or can reasonably be expected to have, special expertise in handling a potentially dangerous product. *See Mays*, 233 Kan. at 59, 661 P.2d 348 (no duty to instruct employer who was experienced in the highly specialized business of hooking up oil and gas wells); *Hittle*, 219 Kan. at 639, 549 P.2d at 1395 (retail distributor of propane well aware of dangerous properties of gas); *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 464 (5th Cir.1976) (stripping crew and its employer were experienced professionals in the field of cleaning tanks that had contained benzene and knew of the dangers of benzene intoxication). Conversely, a manufacturer who sells to unspecialized users is not relieved of its normal duty to warn according to the reasonable and prudent person standard. *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984). Under defendant's conception of the sophisticated user defense, *any* user of a chemical product would be become sophisticated if they used the product often enough and had a "general idea" that the chemical was toxic. Such an expansive interpretation of this limited defense would transform even simple household users into chemical experts. *See American Mutual Liability Ins. Co. v. Firestone Tire & Rubber Co.*, 799 F.2d 993, 994 (5th Cir.1986) (purchaser or user must have certain knowledge or sophistication before manufacturer is relieved of duty to warn, and normally this is a question of fact for the jury). The Coast Guard is not in the general trade or business of "benzene handling" and cannot reasonably be charged as a matter of law with any special expertise or knowledge concerning benzene's carcinogenic properties. *See Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1092–93 (5th Cir.1973) (dangers of asbestos not well enough known to insulation workers to reduce duty to warn), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), *cited in Pavlides*, 727 F.2d at 339; *Hall*, 625 F.Supp. at 1520.

Defendant also relies heavily on the argument that the Coast Guard violated OSHA regulations, and the Coast Guard safety manual incorporating those regulations, by failing to provide Mason with a safe workplace. What defendant neglects to recognize, however, is that neither federal nor Kansas law requires employers to protect against unknown dangers. Under Kansas law, the employer has a duty to protect only against dangers that are either known or could be discovered by the exercise of reasonable care. *Riggs v. Missouri–Kansas–Texas R.R. Co.*, 211 Kan. 795, 800, 508 P.2d 850 (1973); *see also Prince v. Leesona Corp.*, 720 F.2d 1166, 1170–71 & n. 8 (10th Cir.1983); *Murphy v. Owens–Corning Fiberglas Corp.*, 447 F.Supp. 557, 565 (D.Kan.1977) (no evidence that manufacturer/employer knew or should have known of danger created by inhaling fiberglass particles). An employer's responsibilities under the "general duty clause" of the Occupational Safety and Health Act are similar:

Each employer—

(1) shall furnish to each of his employees employment and a place of employment which are free from *recognized hazards* that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this Act.

29 U.S.C. § 654(a) (emphasis added); *Brennan v. Occupational Safety & Health Review Comm'n*, 494 F.2d 460, 464 (8th Cir. 1974) ("recognized hazard" refers to hazards actually known by employer as well as those generally recognized in employer's industry). Accordingly, the Coast Guard safety manual prescribed general or local exhaust[11] for "harmful exposure" to "harmful fumes," and OSHA regulations in

---

11. The term "local exhaust" refers to a vacuum exhaust system that immediately removes the fumes of a chemical from a confined area such as a protective "hood."

effect at the time required that respirators be selected on the basis of the hazard. Tr. Vol. 11, at 968–93. Although benzene was a "recognized hazard," and the Coast Guard safety manual required "suitable safe facilities" for the "storage, handling and use" of hazardous materials, the Coast Guard had only limited knowledge of the hazards of benzene. There is little doubt that the Coast Guard was aware of the dangers of benzene intoxication, or of the flammability of the chemical. Plaintiff's Exh. 139D; Doolan, Tr. Vol. 10, at 943–44. And the evidence indicated that the facilities at Yorktown were entirely adequate to protect against these known hazards. Reid, Tr. Vol. 8, at 739; Seligman, Tr. Vol. 52, at 6843. The specific carcinogenic danger that would have required measures such as local exhaust, however, was not known to the Coast Guard at the time Mason was exposed to benzene.[12]

To reject the jury's assessment of no fault against the Coast Guard would require the court to find, as a matter of law, that the Coast Guard either knew or should have reasonably discovered this latent danger in benzene. This the court is unprepared to do. There was no evidence that the Coast Guard had actual knowledge of benzene's carcinogenic nature. Moreover, the Coast Guard has no special duty to inform itself through independent sources of the potential hazards posed by every chemical product that it purchases for its general use. Rather, an employer is only required to protect against dangers known or discoverable through the exercise of reasonable care. *Riggs*, 211 Kan. at 800, 508 P.2d 850. Under Kansas law the jury generally determines the degree of each ac-

tor's departure from their respective duty. *Prince*, 720 F.2d at 1171. As applied to this case, the jury could properly refuse to impose upon an unspecialized employer the duty to discover every danger associated with the use of benzene, and the verdict with respect to the Coast Guard is reasonable under the evidence.

### B. Mellen Chemical

■ Defendant makes similar allegations against Mellen Chemical Company, the immediate purchaser of Texaco's benzene. Raymond Mellen was the president of a chemical solvent distribution company that employed approximately 13 people. Defendant argues that Mellen was a superseding cause of Mason's death because Mellen was a knowledgeable dealer in benzene who failed to pass on the warning that Texaco had given him.

Defendant's attempts to characterize Mellen as a sophisticated "benzene expert" are particularly unpersuasive. Mellen held a general baccalaureate degree in biology with a minor in chemistry that he had received in 1949.[13] He had accumulated and read "a lot" of literature on the safe use and handling of benzene. There was no evidence, however, that Mellen knew of the carcinogenic hazard of benzene when he made those sales that could have reached Mason at Yorktown. To the contrary, Mellen's deposition testimony reveals that he did not know of this hazard until it was published in the Federal Register in 1977, at which time he began to include this information on his own label. Mellen's educational and business experience reveals that he was little more than a purveyor of chemical solvents, and not a "sophisticated

---

**12.** The critical distinction between the various hazards of benzene was highlighted by the deposition testimony of William Price, a co-worker of Mason who also taught the water and sediment test at Yorktown. After Mason had been diagnosed with leukemia, Price happened to discover a pamphlet that set forth the three major hazards of benzene: flammability; acute toxicity from breathing high concentrations with "an immediate harmful effect"; and "chronic toxicity" including "leukemia." Upon reading the word "leukemia," Price brought this knowledge to the attention of his Base Chief, Chief Seligman, and the Yorktown facility discontinued its

use of benzene in the test kit. Tr. Vol. 14, at 1306–10. Chief Seligman also testified that before he knew of benzene's carcinogenic danger, he considered ventilation to be adequate if it was sufficient to prevent personnel from being overcome by fumes. Tr. Vol. 52, at 6865.

**13.** Ron Richards from Texaco, who himself had majored in chemistry during the time period from 1955 to 1960, testified that the relationship between benzene and leukemia was not taught in the course of his own undergraduate studies. Tr. Vol. 38, at 3843–44.

user of benzene." Texaco's reliance on Mellen to either understand its warning or look up the crucial information himself was at best thoroughly misplaced, and at worst willful and wanton neglect. *See State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 157, 747 P.2d 1326, 1330 (1987) (intermediary/contractor may have no experience in selecting building materials and manufacturer has duty to warn those who rely on its specifications); *Pavlides*, 727 F.2d at 339 (manufacturer generally does not have the right to assume that persons using complex product will know how it is to be used). Texaco's affirmative duty under *Hittle* was to ascertain that Mellen was adequately trained, was familiar with the carcinogenic properties of benzene, and was capable of passing on this information to his customers. 219 Kan. at 639, 549 P.2d at 1394. The mere assumption by Texaco that Mellen had such knowledge and capabilities is not sufficient to defeat the jury's considered judgment that something more was required of Texaco. *See American Mutual*, 799 F.2d at 994; *see also Restatement (Second) of Torts* § 388 comment n (1973) (supplier may be liable unless he ascertains character of intermediary or unless previous experience with intermediary gives supplier reason to believe that intermediary is careful).

Even assuming that Mellen would have understood the language contained in Texaco's MSDS, there is no evidence that Mellen was aware of the information contained in Texaco's MSDS, nor that Texaco's sales representative had emphasized or even mentioned this information to Mellen. When Mellen purchased benzene from Texaco, he did not receive any information with the product. Tr. Vol. 9, at 765. Rather, the Material Safety Data Sheet was sent separately from the shipment of benzene. Tr. Vol. 9, at 775. The jury could reasonably conclude that this was an inadequate method by which to warn the customers of Texaco. Kansas law imposes no *per se* duty upon a bulk seller to train its salesmen or to warn through such sales-

men. *Mason*, 862 F.2d at 248. The failure to train salesmen and the failure of a salesman to make the purchaser aware of a product's inherent danger, however, may be considered by the finder of fact in determining the overall adequacy of a warning. *Id.* Thus, the jury could reasonably find that Texaco had failed to take adequate steps to bring this information to Mellen's attention. *See also W.G.M. Safety Corp.*, 707 F.Supp. at 549 (even when warning is provided, adequacy of efforts to communicate dangers of product is question for jury).

Defendant also argues that Mellen was required to pass on Texaco's MSDS, which contained certain precautionary instructions, and that the failure to do so destroyed any causal responsibility on the part of Texaco. This argument rests on the mistaken assumption that causation for an inadequate warning is defeated where strict adherence to a manufacturer's instructions would eliminate exposure to the dangerous element of a product. In the court's view, this is simply an attempt to carve an adequate warning out of an inadequate one. Where the warnings given are unclear or inadequate to apprise of the inherent or latent dangers associated with a product, a manufacturer cannot escape liability for injury on the grounds that perfect compliance with its instructions would have prevented the injury. *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1457 (10th Cir.1987) (quoting *Smith v. United States Gypsum Co.*, 612 P.2d 251, 253 (Okla. 1980)). Although a warning should contain precautions or instructions for a product's safe use, an adequate warning must also inform the user of the result that will follow from the failure to observe these instructions. *Ferebee v. Chevron Chem. Co.*, 552 F.Supp. 1293, 1304–05 (D.D.C. 1982), *aff'd*, 736 F.2d at 1539 (D.C.Cir. 1984); *Beauchamp v. Russell*, 547 F.Supp. 1191, 1195 n. 2 (N.D.Ga.1982) (instructions are not warnings).[14] The reason a user has no specific legal duty to use a product in

---

14. Not only does this state the legal duty imposed upon manufacturers, it is also a duty that the jury could reasonably find based upon its own collective experience and the evidence introduced in this case. Wagoner, Tr. Vol. 28, at 2785–86.

accordance with the bare, unembellished instructions of an inadequate warning is that such a warning fails to impress upon the reader the nature and gravity of harm that will follow from the failure to observe the instructions. If Texaco had adequately warned of the carcinogenic danger of benzene exposure in terms understandable to the ordinary user, the users of its product might elect not to purchase benzene at all. Indeed, this is precisely the choice made by the Coast Guard when it finally learned of benzene's carcinogenic propensities. Thus, because a user has no specific legal duty to follow the instructions of an inadequate warning, defendant cannot contend that Mellen's failure to pass on Texaco's MSDS was the legal cause of Mason's injury.[15]

For the same reason, the court rejects defendant's argument that the jury could not reasonably find Mellen to have borne no causal responsibility, even though Mellen did not pass on the information in Texaco's MSDS. A manufacturer's immediate vendee certainly has a duty to convey *adequate* warnings that it has received from the manufacturer. *Younger v. Dow Corning Corp.*, 202 Kan. 674, 451 P.2d 177 (1969); and Kansas law requires that a seller warn of those dangers of which it either knows or has reason to know. *Hittle*, 219 Kan. 627, 549 P.2d 1383, syl. ¶ 4. In this case, however, there was no evidence that Mellen had read Texaco's MSDS, and the jury could reasonably conclude that Texaco's method of conveying its warning was inadequate under the circumstances. *See Holmes v. Sahara Coal Co.*, 131 Ill.App.3d 666, 86 Ill.Dec. 816–819, 475 N.E.2d 1383, 1386 (1985) (fact that manufacturer supplies a warning does mean that warning is adequate to shift or reduce risk inherent in product, and this determination is left to jury). Moreover, even assuming that Mellen was negligent in failing to read the MSDS sent to him separately by Texaco, defendant's argu-

ment does not relate Mason's injury to the failure of Mellen to pass on this information. As already noted, the Coast Guard safety manual itself stated that benzene could cause injury to blood forming organs. Yet no evidence was produced that anyone in the Coast Guard's safety program or at Yorktown understood this language to mean that benzene is carcinogenic. Thus, the jury could reasonably find that Mellen's asserted negligence in failing to convey Texaco's warning was not a proximate cause of Mason's injury.

The salient motif among defendant's numerous arguments is that Mellen and the Coast Guard were sophisticated entities who could have looked up this information themselves. Even if the court were to conclude that Mellen and the Coast Guard were sophisticated intermediaries, defendant's efforts to defeat the jury's verdict would fail nonetheless. Under the "learned intermediary" rule, of which the physician-patient relationship is the most common example, a manufacturer has no duty to warn the ultimate user of the product. Rather, the manufacturer is entitled to rely upon the education and experience of the physician in conveying those adequate warnings provided by the manufacturer. *Wooderson*, 235 Kan. 387, 681 P.2d 1038, syl. ¶ 5. In this respect, the prescription drug rule resembles the "bulk distributor rule" announced in *Jones v. Hittle Serv., Inc.*, 219 Kan. 627, 549 P.2d 1383, syl. ¶ 6 (1976). The prescription drug rule relieves the manufacturer of all liability, however, only when the manufacturer has in fact adequately informed the physician. Additionally, although information regarding a drug's dangerous properties may be "equally available" to physicians, the law does not require them to look such information up themselves. *See Hoffman v. Sterling Drug Inc.*, 485 F.2d 132, 146–47 (3d Cir.1973) (jury should be allowed to decide efficacy of drug literature mailed to physi-

---

**15.** Even if the information in Texaco's MSDS, which prescribed "local exhaust" for benzene, had reached the Coast Guard, evidence indicated that this information would not have been understood. As understood by Chief Petty Officer Larry Seligman, whose duties at the York-

town facility included safety inspection at the engineering school, "local exhaust" meant nothing more than an exchange of air that could be achieved by opening windows and turning on fans. Tr. Vol. 52, at 6859–60. *See supra* at n. 11.

cians where evidence indicates that such literature is generally not read); *Sterling Drug, Inc. v. Yarrow*, 408 F.2d 978, 994 (8th Cir.1969) (reasonable trier of fact could find that sending warning letters, product cards, publishing in the Physicians' Desk Reference, and willingness to answer inquiries were not reasonable efforts to warn physicians who are inundated with such literature); *McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522, 529 & 535 n. 25 (1974) (drug manufacturer must "bring warning home" to the physician, one method of which may be the use of "detail men"), *quoted in Wooderson*, 235 Kan. at 401, 681 P.2d 1038. Thus, defendant seeks to place a burden of discovery upon Mellen and the Coast Guard that is not required even of true learned intermediaries such as doctors of medicine. *See also State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 747 P.2d 1326 (1987) (roof manufacturer liable for actual and punitive damages for failure to warn architect intermediary of unsuitability of roofing material).

■ Defendant also suggests that it is too speculative to assume a causal connection between the numerous deficiencies of its warning and Mason's exposure to Texaco benzene. In support, defendant calls attention to the absence of any testimony by Mellen that use of the word "cancer" would have caused him to pass on a warning. The short answer to this argument is that in Kansas, an inadequate warning is presumed to have caused exposure to a dangerous product. *Wooderson*, 235 Kan. 387, 681 P.2d 1038, syl. ¶ 11.[16] Thus, even if the court were to agree that plaintiff's proof of causation is speculative, the burden is upon defendant to refute the presumption of causation. Moreover, in the court's view, any speculation on this issue is found not in the reasonable inference of causation from an inadequate warning in this case, but in the very type of testimony from Mellen that defendant alleges is necessary to establish a causal link between its inadequate warning and Mason's injury.

*See Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1459 (10th Cir.1990) (trial court could properly exclude speculative and self-serving statements by plaintiff that she would have heeded an adequate warning); *see also Wooderson*, 235 Kan. 387, 681 P.2d 1038, syl. ¶ 12 (what a doctor might or might not have done if adequately warned is not an element plaintiff must prove as a part of case). Similarly, the jury was not required to accept the "undisputed" testimony of Mr. Seligman, Mason's superior at Yorktown, who testified that Texaco's warning would have caught his attention. Neither Seligman nor any other witness is the incarnation of the reasonable and prudent person, by which standard the adequacy of a warning is measured. The jury could properly reject this testimony and find that defendant had failed to rebut the presumption.

Even in the absence of a presumption of causation, defendant's argument does not address the most telling evidence in support of the jury's finding of causation. There is no evidence that any person other than Texaco in the chain of distribution and use was aware of the carcinogenic danger of benzene at the relevant times. With the notable exception of Texaco, however, each entity within this chain altered its conduct when it finally learned of this danger. Mellen began to warn of the cancer hazard in 1977 as soon as he was informed through the Federal Register. Dooner & Smith ceased selling benzene also as a result of the information published in the 1977 Federal Register. Gerin and the Coast Guard first learned of benzene's carcinogenic hazard through this very case, and immediately discontinued its use. Thus, what the parties actually did, as opposed to what they would have done if they had received Texaco's MSDS, belies defendant's suggestion that an adequate warning in this case would have been to no avail.

■ Finally, the cursory suggestion is made that defendant cannot be held liable,

---

16. Defendant does not concede the existence of this presumption and takes great issue with the court instructing the jury in accordance with

the holding of *Wooderson*. *Supra,* at section V.A.

because the position of Texaco, who was the first link in the chain of distribution, was ill-suited to control the content of the warning ultimately received by the user. This fact, however, does not relieve Texaco of its duty under *Hittle* to warn its immediate purchaser. 219 Kan. at 639, 549 P.2d at 1394; *see also GAF Corp.*, 242 Kan. at 157, 747 P.2d at 1330 (although manufacturer does not deal with ultimate consumer, but with intermediary architect or contractor, manufacturer still has duty under *Wooderson* to warn). As the foregoing analysis demonstrates, a reasonable finder of fact could conclude that Texaco failed to fulfill its duty to provide an understandable warning to its customers or to otherwise ascertain the ability of its customers to warn others of benzene's carcinogenic propensities. As a manufacturer with its own independent research program, Texaco was in a far superior position to discover latent dangers in its product and to warn of these dangers. *See GAF Corp.*, 242 Kan. at 157, 747 P.2d at 1330; *see also Pavlides*, 727 F.2d at 338 (manufacturer's duty to warn is derived from the notion that warning costs very little and can prevent severe losses); *Beauchamp*, 547 F.Supp. at 1197 (manufacturer stands in best position to collect and disseminate information regarding dangers of a product); *Michalko v. Cooke Color & Chem. Corp.*, 91 N.J. 386, 451 A.2d 179, 187 (1982) (quoting *Beshada v. Johns–Manville Prods. Corp.*, 90 N.J. 191, 201–02, 447 A.2d 539, 545 (1982)). Texaco had discovered and was aware of numerous scientific studies and reports indicating a relationship between benzene exposure and cancerous blood diseases. Rather than communicate this information to its immediate purchaser, its chose to withhold it until persuaded by more conclusive evidence. Alternatively, it relied upon Mellen to discover this danger himself, either by reading and then deciphering Texaco's MSDS, or by learning of the danger through independent sources. In light of the failure of defendant even to initiate the process of information, the jury could reasonably conclude that the distributors and users of

Texaco's benzene share no causal responsibility for the death of Mason.

## C. The Gerin Corporation

■ Defendant also contends that Gerin was a superseding cause of Mason's injuries for mislabeling the benzene it sold to the Coast Guard. The Gerin label provided with the benzene sold to the Coast Guard represented conformity with specification 96 of the American Society of Testing Material ("ASTM 96"), which stated that toluene is a preferred solvent to benzene. Defendant claims that this representation was false, and that the jury erred by failing to find any fault on the part of Gerin.

The court initially notes that the "falseness" of Gerin's label is far from clear. As Albert Stewart from the Coast Guard recognized, a specification that states a preference is not the equivalent of a requirement. Tr. Vol. 20, at 1833. Moreover, there was some dispute as to whether ASTM 96 applied to lube oil such as that being tested by the Coast Guard or only to crude oil. Defendant also fails to appreciate that by shipping benzene, Gerin sold to the Coast Guard exactly what it had ordered. Nor was there any evidence that the Coast Guard relied on this representation in using the product. *See Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 469, 738 P.2d 1210, 1230 (1987) (test for fraud is whether any misrepresentation caused plaintiff's injury). But more directly to the point, defendant's argument elides any analysis of Gerin's fault with respect to its duty. Under Kansas law, a seller has a duty to warn "only when he knows or has reason to know that the product is or is likely to be dangerous for the use for which it is supplied." *Hittle*, 219 Kan. 627, 549 P.2d 1383, syl. ¶ 4. There is no evidence that Gerin had actual knowledge of benzene's carcinogenic propensities until after Mason was diagnosed as having leukemia. And as with Mellen, the jury's refusal to impose upon Gerin a constructive knowledge of this danger is reasonable.[17]

---

17. It is possible that the constructive knowledge standard imposed upon Gerin under Kansas law

has been preempted by federal common law. In *Boyle v. United Technologies Corp.*, 487 U.S.

Thus, even assuming that Gerin misrepresented the product it sold to the Coast Guard, defendant has made no showing how this contributed to Mason's exposure to benzene.

### IV. Rulings

Defendant also takes issue with a number of rulings alleged to have been erroneous and requiring a new trial.

#### A. Law of the Case

 Defendant alleges that the doctrine of "law of the case" precluded the relitigation of the issue of punitive damages, and that submission of this issue to the jury requires a new trial. In the first trial of this case the jury awarded no punitive damages. Plaintiff moved for a new trial limited to the issue of punitive damages, and the court denied this motion. Plaintiff did not appeal this ruling, and the Tenth Circuit's decision reversing the judgment never addressed this court's denial of plaintiff's motion. On remand, defendant made a pretrial motion to exclude the issue of punitive damages in this retrial. In its pretrial motion, and again in the present motion for new trial, Texaco contends that plaintiff's failure to appeal this court's denial of a new "punitive damages" trial prevents her from relitigating this matter.

The mandate of the Tenth Circuit in this case reversed the first judgment generally and remanded for a new trial. Normally when an appellate court vacates a judgment, neither collateral nor direct estoppel, nor the law of the case will give preclusive effect to this judgment. *No East–West Highway Comm., Inc. v. Chandler,* 767 F.2d 21, 24 (1st Cir.1985); *see also Fox v. Mazda Corp. of Am.,* 868 F.2d 1190, 1194 (10th Cir.1989) (law of the case doctrine applies only when there has been a final decision); *Ramey Construction Co. v.*

*Apache Tribe of Mescalero Reservation,* 673 F.2d 315, 318 (10th Cir.1982) (general remand by court of appeals allows district court to reconsider issues); *Dodrill v. Ludt,* 764 F.2d 442, 444 (6th Cir.1985). Thus, once a new trial is granted, preclusion does not extend "to any matter that is left open for further proceedings," but rather is "limited to matters actually resolved by the appellate court." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4432, at 302 (1981); *see also Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979) (doctrine of law of the case affects only issues determined on previous appeal, and on remand lower court may consider any matters left open by appellate court's mandate).

Defendant does not contend that the first jury's denial of punitive damages itself precludes relitigation of this issue as a matter of direct or collateral estoppel. Instead, defendant relies upon the doctrine of law of the case. Unlike the various rigid rules of *res judicata,* the more amorphous concept of law of the case determines whether a court's prior decision on a rule of law should continue in force in subsequent stages of the same case. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). As it is most frequently applied, law of the case encompasses a lower court's adherence to its own prior rulings, to the rulings of its superior court in the case, or to the rulings of another judge or court in the same case or a closely related case. 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 788 (1981). Defendant bases its argument on a less common fourth aspect of the doctrine, under which courts will give preclusive effect to a ruling that could have been appealed, but has

---

500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Court held that an independent government contractor may be held liable for defective design only if that contractor has actual knowledge of a danger unknown to the United States. *Id.,* 108 S.Ct. at 2518; *see also Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1487 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989). Because defendant does

not contend that Gerin had either actual or constructive knowledge of the carcinogenic danger of benzene, the court will not consider the applicability of the *Boyle* doctrine to the facts of this case. *See Dorse v. Armstrong World Indus., Inc.,* 716 F.Supp. 589 (S.D.Fla.1989) (concluding that *Boyle* is not strictly limited to design defect cases and also applies to claims of failure to warn), *aff'd,* 898 F.2d 1487 (11th Cir.1990).

been abandoned by a failure to do so. *Id.* § 4478, at 801.

It should be noted that the law of the case doctrine is implicated here only as a result of plaintiff's motion for new trial for punitive damages and the court's previous ruling on that motion. Plaintiff did not appeal this court's denial of her motion, and defendant argues that this ruling must stand as the law of the case. Strictly speaking, this prior ruling does remain the law of the case, and the court would be no more inclined now to grant plaintiff a new trial limited to punitive damages than it was six years ago. A court may order a new trial on the grounds that the damage award is unreasonably low. *Fox Motors, Inc. v. Mazda Distributors, Inc.,* 806 F.2d 953, 961 (10th Cir.1986); *Brown v. Richard H. Wacholz, Inc.,* 467 F.2d 18, 20–21 (10th Cir.1972). In addition, a new trial may be properly limited to the question of damages where the damage and liability issues are distinct and separate. *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *K–B Trucking Co. v. Riss Int'l Corp.,* 763 F.2d 1148, 1163 n. 22 (10th Cir. 1985). However, these principles have developed within the context of compensatory damages, and it is doubtful whether it would ever be appropriate for a court to grant a new trial limited to relitigating the issue of punitive damages.[18] Because punitive damages are inextricably interwoven with the issue of liability, the courts have recognized that it would be impossible to order a retrial limited solely to the issue of punitive damages. *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1388 (8th Cir. 1983) (citing cases), *cert. denied,* 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984).

Defendant asserts that plaintiff's "procedural maneuvering" has deprived Texaco of the opportunity to defend this court's ruling denying a new trial on punitive damages. The court does not ascribe the same sinister motives to plaintiff's decision not to pursue a patently frivolous request. In any event, it would have been unnecessary for defendant to "defend" a previous ruling of law to which this court would still adhere if presented with the same question: plaintiff is not entitled to a new trial limited to the issue of punitive damages. *See Key v. Wise,* 629 F.2d 1049, 1054 (5th Cir. 1980) (applicability of law of the case necessarily depends on whether the question as to which it is asserted was decided previously by the court), *cert. denied,* 454 U.S. 1103, 102 S.Ct. 682, 70 L.Ed.2d 647 (1981). After the general reversal and remand by the Tenth Circuit, however, this ruling became moot, because the posture of this case had changed. By virtue of defendant's successful appeal, the court was no longer confronted with the propriety of granting plaintiff a new trial on the issue of punitive damages.

Under defendant's argument, a party who is forced to relitigate a lawsuit because of its opponent's successful appeal may never fare any better upon retrial of the issues unless that party has performed the perfunctory task of itself filing a notice of appeal on issues that have been decided adversely to it. Thus, the logical extension of this rule would mean that the second jury in this case could not find Texaco to have been more than 35% at fault and would limit plaintiff's compensatory damages against Texaco to the amount awarded in the first trial. But as the Sixth Circuit has explained, a party is not required to appeal every issue decided adversely to it in order to preserve relitigation of that issue in the event of a reversal:

> Any other rule would needlessly and astronomically proliferate the number of issues raised on appeal. If a judgment could be entirely vacated yet preclusive effect still given to issues determined at trial but not specifically appealed, appellants generally would feel compelled to appeal every contrary factual determination. Such inefficiency neither lawyers

---

**18.** Of course, this does not preclude the possibility of limiting a trial to the issue of punitive damages where the defendant admits liability, but disputes any claim for punitive damages.

*See Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186, 190 (4th Cir.1982), *cert. denied,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983).

nor judges ought to court. Litigants ought to be encouraged to expend their energies on their most compelling issues and arguments, without paranoia about the preclusive effect of other issues or determinations.

*Dodrill,* 764 F.2d at 444. These observations apply with particular force here, in light of the frivolous nature of plaintiff's request for a new trial limited to punitive damages. Thus, the court rejects the argument that plaintiff was precluded from relitigating the punitive damage issue simply by failing to perform the futile and useless gesture of appealing this court's order.

Defendant relies on language contained in a footnote from a decision by the Fourth Circuit as a case "directly on point." In *Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186 (4th Cir.1982), *cert. denied,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983), defendant had admitted liability but disputed the amount of compensatory and exemplary damages. The jury awarded compensatory damages in an undifferentiated lump sum, but denied any punitive damages. Upon defendant's post-verdict motion, the trial court ruled that it had erred by allowing the jury to consider pain and suffering as a compensable item, and thus ordered a remittitur of the compensatory damages. The appellate court held that this remittitur was improper and remanded for a new trial on compensatory damages. In closing the court noted:

> The sole issue before the district court upon remand is that of compensatory damages. The district court's suggestion that if a new trial were ordered on appeal it would be conducted as to both punitive damage liability and compensatory damages is of no force. The district court denied plaintiffs' motion for a new trial on the punitive damages liability issue, and plaintiffs did not appeal from that order. This ruling, unappealed, was not in consequence subject to defense by [defendant] on appeal and [defendant] is entitled to have it treated as the law of the case.

*Id.* at 206 n. 22.

The court believes that Texaco's reliance on this case is misplaced. The court in *Arnold* remanded only on the issue of compensatory damages. The issues underlying the defendant's liability were uncontested, and the plaintiffs had failed to appeal the trial court's denial of a new trial limited to punitive damages. In such a situation, the appellate court never had the opportunity to review any of those issues common to liability and punitive damages, and a retrial that included punitive damage liability would have required the relitigation of issues uncontested on appeal. Thus, this decision reflects little more than the policy of judicial efficiency that underlies law of the case principles generally. *Gage v. General Motors Corp.,* 796 F.2d 345, 349 (10th Cir.1986). By contrast, Texaco's successful challenge on appeal vacated the jury's finding of liability and the issues underlying this finding. *Dodrill,* 764 F.2d at 444 (no preclusive effect given to any issues where judgment is vacated). To the extent the decision in *Arnold* is read to create a lurking procedural cul de sac into which the unwary litigant ventures at his own peril, the court rejects this holding as ill-advised *dicta.*

Even assuming that it was error to allow relitigation of punitive damages liability, the grant of an entirely new trial would be inappropriate in this case. Although defendant understandably seeks to cast this as a trial dominated by issues relevant only to punitive damages, the court cannot agree with this characterization. As already noted, there is substantial overlap between the issues underlying punitive damages and liability, because the evidence that must be adduced to support an initial finding of liability is the same evidence considered in determining the propriety of punitive damages. In passing on the punitive damage question, the jury simply considers whether the conduct in question was sufficiently egregious to justify an award above any compensatory damages.

Moreover, as the court instructed without objection, much of the "post occurrence" evidence such as subsequent warnings issued by Texaco was admissible in any event to prove "the extent of knowledge of Texaco during the relevant time

periods" and "as [an] admission of the truth of plaintiff's contention that benzene was a causative factor of leukemia." Instruction No. 24. Texaco's duty to warn is measured by what it either knew or should have known, and any evidence relating to Texaco's actual knowledge is also relevant to the underlying question of liability. In addition, Texaco has taken the hesitant position throughout this trial that the causal link between benzene exposure and leukemia is still vague and tentative. This position, however, is belied by the unequivocal admission contained in the warnings issued by Texaco in 1979, 1987, 1988, and 1989, wherein the product is clearly labeled as a "cancer hazard." Thus, the warnings issued by Texaco after 1977 were admissible for purposes other than proving the requisite "bad motive" element of punitive damages.

Plaintiff also produced evidence of Texaco's financial status, which the court recognizes is relevant only to the issue of punitive damages. Through the brief introduction of this evidence, plaintiff disclosed to the jury that Texaco, Inc. is a multi-million dollar corporation. In the court's view, the revelation of such public knowledge could hardly be deemed so prejudicial as to require a new trial. The court admonished the jury not to consider Texaco's net worth for any purpose other than assessing punitive damages, if any, (Instruction No. 38), and the court must assume that the jury will abide by the instructions it gives. *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir.1989); *United States v. Hall*, 805 F.2d 1410, 1417 (10th Cir.1986). Thus, even assuming error, the court concludes that this would be harmless as it relates to the determination of liability and compensatory damages. Fed.R.Civ.P. 61.

#### B. Accuracy of Transcript

■ Defendant contends that the court erred by finding as a fact disputed testimony given at the first trial of this case. Before the scheduled testimony of Ron Richards, the Texaco industrial hygienist who drafted its warnings, defendant made a motion to change one word of the transcript from Mr. Richards' testimony at the

first trial. Defendant's counsel had contacted the court reporter from the first trial, who consulted his notes and decided that he had erroneously transcribed his notes on that word. The motion to alter the record was a matter of great importance to defendant, and the court held no less than three hearings entertaining defendant's motion, including an evidentiary hearing with the former reporter. After each of these hearings, the court ruled that the transcript would not be changed.

The disputed word from the first trial's transcript arose during cross-examination of Mr. Richards. In response to a question by plaintiff's counsel, Mr. Richards stated:

Well, it might have been either when I, shortly after I got into the profession, certainly after graduate school in the early '60's it was very clear that there was some instances under some circumstances where benzene was at least *causally* associated with leukemia.

First Trial Tr. Vol. 20, at 6 (read into the record by Mr. Michaud, Tr. Vol. 39, at 3984) (emphasis added). Mr. Richards testified that he believed he said "casually" and not "causally" at the first trial some 6 years before, and that either he had misspoken or the court reporter had made an error.

As defendant correctly notes, "[t]he transcript in any case ... shall be deemed prima facie a correct statement of the testimony taken and proceedings had...." 28 U.S.C. § 753(b). The party attacking the accuracy of the transcript has the burden of overcoming the presumption of correctness. *United States v. Bergmann*, 836 F.2d 1220, 1222 (9th Cir.1988). The court first notes that the colloquy between Mr. Richards and counsel during the first trial was devoted exclusively to the "causal" association between benzene and leukemia. Thus, defendant's insistence that Mr. Richards said "casual" appears incongruous within the context of the discussion. Moreover, the events at the evidentiary hearing on this matter demonstrated the ill-founded reliance of defendant on the court reporter to render a flawless account of what Mr. Richards had said. At this hearing, the following exchange took place between the

court, plaintiff's counsel, and Mr. Gibson, the reporter who took the notes during the first trial:

> Mr. Michaud: Page nine, look at line three and we use there the word again causal as compared to casual, right?
>
> Mr. Gibson: That is true, the word causal, C.A.S.U.A.L. was used at the point.
>
> The Court: How do you pronounce it, causal, casual?
>
> Mr. Gibson: Your Honor, causal at that point. C.A.U.S.A.L.
>
> The Court: Well, my only deal is whether you pronounce it S.H. or S., causal or casual you say casual. You use the S.H. on cause and you use the S. and he said, casual.
>
> Mr. Gibson: Cause, that's why I'm spelling them so my pronunciation if I'm in error I'm spelling the words for the reporter.
>
> . . . .
>
> Mr. Michaud: And just as the Judge said a moment ago you said casual and what you really meant when you were reading was C.A.U.S.A.L., wasn't it?
>
> Mr. Gibson: Yes.

Tr. Vol. 36, at 3561–62 & 3565; *see also* Tr. Vol. 39, at 3943–44. In fact, throughout this hearing, Mr. Gibson repeatedly mispronounced the word "causal" as if it had the "zh" sound of "casual."

Defendant ventures onto rather tenuous ground by relying on a court reporter who apparently has difficulty distinguishing between the sounds of these two words. The cassette tape recording of this testimony is no longer available, and it is therefore impossible for anyone—including Mr. Richards—to say conclusively which word was spoken over 6 years ago. Contrary to defendant's present characterization, the court did not find as a fact that the reporter had correctly transcribed the word. Indeed, although defendant's counsel implored the court to "take a side on this issue," the court declined to enter this fray and expressed no view to the jury one way or the other. Tr. Vol. 39, at 3940–44. Rather, the jury was allowed either to accept or reject Mr. Richards' testimony that he had misspoken or that the transcript was incorrect due to a reporter error. It would have been entirely appropriate to instruct the jury regarding the prima facie presumption of correctness of the transcript, but the court also refrained from doing even this much.

The court believes that its refusal to alter the record was a harmless matter beyond any principled doubt. Although defendant maintains that the difference between "causal" and "casual" association is a matter of great moment, the court is confident that the subtleties of this distinction were sufficiently abstruse as to defy the comprehension of even the most adroit juror. Thus, the court perceives no error in refusing to find the facts requested by defendant.

### C. Expert Qualifications

■ Defendant asserts that the court allowed unqualified experts to testify for the plaintiff. Texaco argues that Drs. Infante and Wagoner, as epidemiologists, had no qualifications to express a medical opinion regarding the cause of Mason's leukemia. Because the science of epidemiology is only concerned with disease as it manifests itself in populations, defendant contends that these epidemiologists were not competent to express an opinion on the cause of a given case of leukemia.

"A trial judge has broad discretion in determining the competency of an expert witness." *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1458 (10th Cir.1990). In making this determination, two general conditions must be met.

> [F]irst, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.

*Graham v. Wyeth Laboratories*, 906 F.2d 1399, 1407–08 (10th Cir.1990) (quoting *Bridger v. Union Ry. Co.*, 355 F.2d 382, 387 (6th Cir.1966)).

The court agrees that in many cases, "resolution of the causation issue turns on the testimony of the treating and evaluating physicians." *Sulesky v. United States*, 545 F.Supp. 426, 430 (S.D.W.Va.1982). But individual cases of benzene related leukemia do not lend themselves to the same certainties as do diseases such as asbestosis, whose cause is readily attributable to a particular agent or class of agents. As every witness testifying on the causation issue conceded, it is medically impossible to establish an absolute causal link between a given case of leukemia and benzene exposure because there is simply no clinical test or examination that a physician can conduct to make this determination.

A medical degree or training does not confer any magical qualities upon those experts for both plaintiff and defendant who testified on the causation issue. In this case it is only the fortuitous acquaintance of Dr. Reid—the treating physician—with a body of *epidemiological* literature relating benzene exposure to leukemia that enabled Dr. Reid to express any opinion as to the cause of Mason's leukemia. If the jury could properly conclude that Mason developed leukemia as a result of his exposure to benzene, it would necessarily have to base its conclusion in large part upon Mason's dosage, duration of dosage, and latency periods—parameters that have been established and defined through epidemiological studies conducted by epidemiologists.[19] Thus, it would be incongruous to suggest that an epidemiologist may not express an opinion on the causation issue, while allowing the treating physician, and hence the jury, to infer causation based on precisely the same data that epidemiologists have collected and that an epidemiologist would rely on at trial. In light of the realities limiting any clinical determination of the cause of Mason's leukemia, the court finds that experts such as Drs. Infante and Wagoner were not only competent, but uniquely suited to express an opinion on the causation issue. Defendant's wooden application of the rule stated in *Sulesky* is unavailing as applied to the facts of this case.

The court additionally notes that defendant's reliance on *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir.1989), *modified*, 884 F.2d 166, *cert. denied*, —— U.S. ——, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990), is misplaced. In *Brock* the court ordered dismissal of a suit brought to recover damages for birth defects alleged to have resulted from the mother's ingestion of the drug Bendectin during pregnancy. Due to "the lack of conclusive epidemiological proof" *generally* linking the drug Bendectin to birth defects, the court held that the trier of fact was unable to make a reasonable inference on the issue of causation. 874 F.2d at 313. In the present case, however, the epidemiologic proof linking benzene to leukemia is legionary, and the causation issue is whether Mason's leukemia can reasonably be linked to his exposure to benzene. Because causation in this case must be either established or refuted almost exclusively on the basis of epidemiological data, Drs. Wagoner and Infante were competent to express an opinion on this issue.

#### D. Prior Pleadings

Defendant also alleges error for the court's order precluding cross-examination of Mrs. Mason with the prior pleadings in this action. Defendant sought to cross-examine Mrs. Mason with these pleadings under Fed.R.Evid. 801(d)(2)(C) and 613 for the purpose of disclosing adverse evidentiary admissions and also for impeaching plaintiff's assertion at trial that only Texaco was responsible for the death of her husband. In a published order, the court precluded cross-examination of Mrs. Mason with these pleadings, but also ruled that defendant could introduce the pleadings into evidence in its case in chief for the purpose of disclosing prior positions taken.

19. Conversely, the only information that defendant's experts relied upon to reach a contrary conclusion on this issue was the dosage and latency periods of Mason's benzene exposures. Thus, if the court were to adopt defendant's apparent belief that epidemiological data is incompetent to establish the cause of Mason's leukemia, this would also preclude defendant's experts from testifying on the causation issue.

129 F.R.D. 542. This order also allowed plaintiff to introduce defendant's prior answers for the same purpose. After issuing this order, defendant declined to introduce plaintiff's pleadings into evidence. Instead, defendant made a "proffer" of the very evidence that the court had already ruled was admissible in its previous order. Defendant now challenges the court's order on two grounds.

First, defendant claims that cross examining Mrs. Mason with her earlier pleadings "was the only way defendant had of informing the jury of her inconsistent position." Dkt. No. 494, at 61. The court is perplexed by this assertion, insofar as it is irreconcilable with the specific and unambiguous directive of the court's order that defendant be allowed to read plaintiff's pleadings into evidence for the "purpose of disclosing prior positions taken." 129 F.R.D. at 547. Second, defendant contends that the court's order forced it "to choose between foregoing use of this probative, important evidence, or extending to plaintiff's counsel a license to creatively explain away the damaging position taken by plaintiff at earlier stages of this litigation." Dkt. No. 494, at 61–62. It is unclear from this argument whether defendant objects to allowing plaintiff to offer any explanation or merely an effective, coherent explanation for the absence of former parties. Regardless, the law is clear on this matter: if a party offers the pleadings of an opponent into evidence for the purpose of disclosing prior claims made or parties sued, the opponent must be given an opportunity to explain the absence of these former claims or parties. *Williams v. Union Carbide Corp.*, 790 F.2d 552, 556 (6th Cir.1986); *Haynes v. Manning*, 717 F.Supp. 730, 733 (D.Kan.1989) (citing *Dreier v. Upjohn Co.*, 196 Conn. 242, 247, 492 A.2d 164, 167–68 (1985)). A contrary rule would violate fundamental concepts of fairness.

Defendant's asserted fear of the jury succumbing to counsel's beguiling explanation is premised on a series of assumptions:

(1) that plaintiff's counsel would have elected to offer any explanation for the absence of the former defendants; (2) that the explanation chosen by Messrs. Michaud and Cordry, two officers of the court, would have misrepresented matters of public record in this case that had been stated orally before the court (Tr. Vol. 36, at 3574–75); and (3) that the court would have countenanced such conduct and would not have delivered a corrective instruction after closing argument. The court declines to join defendant on this quest for speculative error. Even if defendant had introduced the pleadings, it is entirely possible that plaintiff's counsel would not have addressed the issue of former parties. As the court observed in its previous order, disclosure of plaintiff's settlement with Gerin would follow once plaintiff decided to risk an incomplete explanation for the absence of the former defendants. 129 F.R.D. at 546. The "chilling" effect of this knowledge might well have counseled plaintiff's attorney to devote closing argument to more fruitful endeavors, such as discussing probative evidence.[20]

Introducing the pleadings in the manner allowed by the court did no violence to the rule that the statements made by counsel within the scope of the attorney-client relationship are admissable against the client. *Frank v. Bloom*, 634 F.2d 1245, 1251 (10th Cir.1980). Rather, the court's order simply recognized that clients will rarely, if ever, be in a position to explain the legal theories and strategies chosen by their lawyers. If defendant considered the probative value of these pleadings to be of such weight, the court's order clearly afforded it the opportunity to use the pleadings both substantively and as impeachment evidence. The modest restriction on the manner of introducing this evidence was a proper and circumscribed use of the court's "considerable discretion in determining the conduct of a trial, including the orderly presentation of evidence." *Thweatt v. Ontko*, 814 F.2d

---

**20.** Likewise, defendant had good reason for wanting to withhold from the jury the reason for the absence of former defendant Ashland, perhaps accounting for defendant's trepidation in opening the door on this matter in the first instance by introducing plaintiff's pleadings into evidence. *See* 129 F.R.D. at 546 n. 1.

1466, 1470 (10th Cir.1987); *see also Boren v. Sable,* 887 F.2d 1032, 1037 (10th Cir. 1989).

### E. Impeachment of Character

 Defendant alleges error for the court's refusal to allow certain impeachment of Drs. Wagoner and Infante, two of plaintiff's expert epidemiologists. During cross examination, defendant sought to impeach Dr. Wagoner's credibility with criticisms of a "beryllium" study that had been published by Wagoner and Infante. These impeaching documents had been written by another scientist and were highly critical of the conclusions reached by Infante and Wagoner regarding the carcinogenicity of beryllium. The documents referred throughout to the misleading, careless, or otherwise unprofessional "tendencies" of the authors. The court sustained plaintiff's objection to the use of these documents as improper character impeachment that would confuse the issues of this case with an undue excursion into unrelated substances.

Defendant confuses the distinction between character assassination and proper impeachment technique under the federal rules. It is conceded that the only "impeachment" purpose served by these documents is to impugn the scientific character of plaintiff's experts. Under Fed.R. Evid. 608(a), however, direct impeachment of a witness' character is limited to opinion or reputation evidence concerning that witness' character for truthfulness or untruthfulness. *See also United States v. Awkard,* 597 F.2d 667, 671 (9th Cir.) (opinion testimony on credibility is limited to character for truthfulness or untruthfulness), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979). Defendant has also suggested that the beryllium studies are proper impeachment under Fed.R.Evid. 608(b), which allows an attack on credibility through specific instances of conduct. It is not the conduct of plaintiff's experts that defendant seeks to use for attacking their character for truth, but rather the opinion voiced by others concerning this conduct. Counsel may no more use a scientist to make accusations of a "misleading," "care-less," or "unscientific" character than if defendant sought to make these same accusations through a lay witness. The federal rules do not confer any special status upon the opinions of a scientist who believes that his colleagues' work reveals a misleading character, and such "scathing" criticisms among members of the scientific community have no more place in a courtroom than would the vitriolic, *ad hominem* arguments frequently exchanged between constitutional scholars. Once the court has determined that a witness is qualified to render an expert opinion, opposing counsel is limited by the same impeachment rules governing all witnesses.

### F. Emergency Temporary Standard

Defendant also raises several specific instances in which the court is alleged to have allowed plaintiff's counsel to violate an earlier order concerning litigation involving the American Petroleum Institute ("API lawsuit"). This litigation was brought by several parties, including the API, challenging a 1977 emergency temporary standard promulgated by OSHA that established a one part per million ("1 ppm") exposure limit value for benzene in the workplace. Texaco was not a party to this lawsuit. The American Petroleum Institute, of which Texaco is a member, successfully challenged the emergency standard in the Fifth Circuit, whose ruling was upheld in an extensive opinion by the United States Supreme Court. *Industrial Union Dep't v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980). Specifically, the Court held that OSHA had violated its statutory mandate by failing to determine whether benzene "poses a significant health risk in the workplace and that a new, lower standard is therefore 'reasonably necessary or appropriate to provide safe or healthful employment and places of employment.'" *Id.* at 615, 100 S.Ct. at 2850. In 1988, OSHA issued a new standard for benzene exposure that is similar in most respects to the 1977 emergency standard.

Plaintiff sought to introduce evidence of the API's opposition to the 1977 emergency

standard for the purpose of showing a "continuing course of deceptive conduct with respect to the tremendous hazards associated with exposure to benzene...." Dkt. No. 381, at 8. Plaintiff asserted that Texaco had information as early as 1941 indicating that leukemia could result from benzene exposures as low as 1 ppm. In light of this knowledge, plaintiff argued that Texaco's opposition, through the API, to the emergency standard demonstrated a callous and indifferent attitude toward persons exposed to benzene in the workplace. In addition, plaintiff sought to introduce evidence of the lawsuit, and the 1988 adoption of an identical standard, to prove that 198 deaths resulted from the delay in implementing a valid regulation.

The court sustained Texaco's objection to this evidence. The court ruled that attributing a lawsuit filed by the API to defendant, solely by virtue of Texaco's membership in the API, would be tantamount to guilt by association. The court also precluded plaintiff from attempting to quantify the number of deaths that might have resulted from the delay in implementing the 1 ppm standard, on the basis of the speculative nature of such evidence.

 Before addressing defendant's specific allegations of misconduct with respect to the API lawsuit, a further clarification of the court's ruling is necessary. Contrary to defendant's present assertion, the court never precluded introducing evidence of positions taken by Texaco *individually* with respect to OSHA's efforts to lower the workplace exposure limits to benzene. For several reasons, the court repeatedly

rejected defendant's attempts to insulate Texaco's own private actions from scrutiny under the auspices of the *Noerr–Pennington* doctrine.[21] First and foremost, Texaco was not a party to the API lawsuit. Thus, defendant's First Amendment right to petition the courts is not implicated by evidence of its own private positions expressed on other persons' lawsuits. Further, even assuming an identity between Texaco and the API, the *Noerr–Pennington* doctrine would have no applicability to this case. As stated in the seminal *Pennington* decision:

> It would of course still be within the province of the trial judge to admit this evidence [of first amendment activity] if he deemed it probative and not unduly prejudicial, under the "established judicial rule that *testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.*"

*United Mine Workers v. Pennington*, 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 1593 n. 3, 14 L.Ed.2d 626 (1965) (emphasis supplied). Accordingly, courts have invoked the doctrine only where the cause of action itself is based on the act of lobbying or filing a lawsuit. *Cf. MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1160 (7th Cir.) (defendant's actions before FCC admissible as evidence of the purpose and character of decisions that were relevant to charges not based on defendant's

---

21. The *Noerr–Pennington* doctrine originates from the Supreme Court's decisions in *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The doctrine was developed in recognition of the chilling effect on first amendment rights that would ensue if a group's assertion of these rights could then form the basis of liability in a subsequent lawsuit. Although the doctrine first evolved in the antitrust arena and initially encompassed only the first amendment right to lobby the legislative branch, the Court has extended the doctrine to protect the first amendment right to petition the courts, *Califor-*

*nia Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), and has also applied the doctrine to areas of litigation other than antitrust. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (unfair labor practice); *see also South Dakota v. Kansas City Southern Indus., Inc.*, 880 F.2d 40, 50 (8th Cir.1989) (intentional interference with contractual relationship), *cert. denied,* — U.S. ——, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990); *Surgidev Corp. v. Eye Tech., Inc.*, 625 F.Supp. 800, 803 (D.Minn.1986) (tortious interference with corporation's public offering), *aff'd*, 828 F.2d 452 (8th Cir.1987).

first amendment activities), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1196 (8th Cir.1982) (exempt conduct may be considered to the extent it tends to show purpose or character of nonexempt activity); *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 543 n. 7 (5th Cir.1978) (evidence of activity protected by *Noerr* doctrine admissible to show purpose and character of other non-protected activity if not unduly prejudicial), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). Because plaintiff's claim of failure to warn adequately is based on actions other than the API lawsuit, evidence of Texaco's own position regarding this lawsuit does not fall within the proscriptive sweep of *Noerr–Pennington.*

To the extent that defendant's present objections go to the very mention of OSHA's benzene emergency standard, the foregoing clarification dispenses with such arguments. The court only precluded attribution of the API lawsuit to Texaco as evidence of Texaco's state of mind. As to Texaco's own individual actions, however, Texaco's express opposition to this standard, in light of its purported knowledge of the necessity of a 1 ppm limit, would indicate a conscious indifference for workplace safety relevant to the issue of punitive damages. Fed.R.Evid. 404(b).

 Defendant raises two instances of a violation of the court's ruling. During cross-examination of defendant's expert Dr. Labarthe, plaintiff's counsel posed the following question:

And what really has happened so we can get the full picture, Dr. Labarthe, is that when the parts per million and the ceiling limit was gradually coming down, eventually in the mid seventies *Texaco,* Gulf, Exxon and other petrochemical companies, *through the API* started hiring people like you to do a review of the existing studies in an attempt to justify keeping the level at 10 parts per million, isn't that what happened?

Tr. Vol. 56, at 7310–11. At this point, defendant objected and was promptly sustained by the court. As this excerpt reveals, plaintiff's counsel impermissibly attempted to attribute the API's actions to Texaco. The court considers this infraction to have been harmless within the context of the entire trial. The jury was repeatedly admonished that the statements of counsel are not evidence. In addition, the context in which this question was asked was an ongoing attempt by plaintiff's counsel to establish possible bias on the part of Dr. Labarthe, who began working on a benzene-leukemia study for the API in late 1985.

Defendant also alleges prejudicial error for the following question asked of Dr. Labarthe regarding "the Tabershaw study":

Mr. Michaud: Was one of [the study's] purposes to try and gather data so that the ceiling limit and the parts per million permissible wouldn't be reduced?

Tr. Vol. 56, 7313. The court is at a loss to understand how this question violated its earlier order regarding the API lawsuit. Defendant had previously introduced this study into evidence, and plaintiff's counsel was attempting to impugn its credibility by demonstrating that the study's conclusions were preordained by a financially motivated purpose. Although defendant vigorously disputes this suggestion, such an apprehension was a matter for the jury to make. Finally, and to repeat, the questions of counsel are not evidence. Whatever the nature of the poison perceived by defendant to have been injected with this question is deemed harmless by any reasonable standard.

### G. Dismissal of Juror

 Texaco contends that the court deprived it of a unanimous verdict under Fed. R.Civ.P. 48 by dismissing the foreperson of the jury, Mr. Pirner. After 6 days of deliberations, the jury informed the court that it had become "locked." The court delivered a modified *Allen* instruction the following day, ending with a suggestion that the jury continue in its efforts to reach a verdict. As the jury began to file out of the courtroom, Mr. Pirner delivered a note to the court, which was then disclosed to counsel

in open court. Tr. Vol. 66, at 8640–44. The letter from Mr. Pirner was addressed to the court:

> Slightly over one year ago, I was rushed to Saint Joseph Hospital with a serious heart condition which was brought on by a great amount of stress caused by my job. I was in coronary care for a number of days and spent an additional amount of time in the hospital after release from coronary care.
>
> This is what brought on my early retirement.
>
> I had no idea at the outset that deliberation in this trial would be as stressful as it has been to me and I am concerned that it is going to cause a return to the condition I experienced in 1989.
>
> My blood pressure readings and other complications necessitated a visit to my doctor on Friday, January 12th 1990 and my doctor shares my concern. My doctors [sic] letter of recommendation is enclosed and I ask that you honor his request.

This letter was signed by Mr. Pirner. The letter from Mr. Pirner's doctor was addressed "To Whom It May Concern" and stated:

> Larry Pirner was seen this day with acute nervous reaction, hypertension and acute insomnia. He should be released from jury duty at this time.

This letter was signed by Dr. R. Rex Lee, M.D., whom the court recognized as a reputable Wichita practitioner, and dated January 12, 1990. The court discussed the letters with counsel, after which the court decided that the only prudent course of action would be to discharge the juror for health reasons. Although defendant's counsel did not necessarily disagree with the court's decision, (Tr. Vol. 66, at 8642), defendant requested that the court inquire further and moved for a mistrial solely on the grounds of counsel's inchoate feeling that dismissing a juror in the midst of deliberations would deprive Texaco of a fair trial. Both motions were denied.

Federal district courts retain the discretion to remove a juror whose capacity to perform his or her duties has become impaired. *Green v. Zant,* 715 F.2d 551, 555 (11th Cir.1983) (insufficient record based on foreperson's opinion of allegedly incapacitated juror and no medical advice was sought); *see also United States v. Wilburn* 549 F.2d 734, 739 (10th Cir.1977); *Anderson v. Dun & Bradstreet, Inc.,* 543 F.2d 732, 734 (10th Cir.1976). The dismissal of a juror must be justified by factual support or a legally relevant reason. *United States v. Dumas,* 658 F.2d 411, 413 (5th Cir. Unit A Oct. 1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982). Included among the legally relevant reasons for dismissal is a nervous condition or fright. *United States v. Molinares Charris,* 822 F.2d 1213, 1222–23 (1st Cir.1987) (nervous condition); *United States v. Franks,* 511 F.2d 25, 37 & n. 19 (6th Cir.) (no abuse of discretion for trial court to dismiss juror complaining of "nerves," notwithstanding defendant's nonspecific claim of prejudice), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975); *United States v. Baca,* 494 F.2d 424, 427–29 (10th Cir.1974) (fright). If the nature of the juror's disability is evident, a hearing is unnecessary, and the trial court need not permit counsel to make further specific inquiry. *Green,* 715 F.2d at 555; *Baca,* 494 F.2d at 428–29; *see also United States v. Hernandez–Garcia,* 901 F.2d 875, 878 (10th Cir.1990) (trial court correctly refused request to *voir dire* juror who qualified response when polled). Finally, even if dismissal of a juror is shown to be error, a further showing of prejudice is required to constitute reversible error. *Anderson,* 543 F.2d at 735.

In support of its argument, defendant relies on *United States v. Brown,* 823 F.2d 591 (D.C.Cir.1987). In *Brown,* the court inquired of a juror who had sent a note to the court stating that he was unable to discharge his duties as a jury member. The court specifically ascertained that the juror's note had nothing to do with his health. *Id.* at 594. Instead, the juror indicated that he disagreed with the law applicable to the case, and also that he had difficulties with the evidence. The trial court dismissed this juror on the ground that his disagreement with the law prevent-

ed him from discharging his duties. On appeal, the court found that the defendants' Sixth Amendment right to a unanimous verdict had been violated, because the juror had also indicated doubts as to the sufficiency of the evidence. Under these circumstances, the court held that "if *the record evidence* discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Id.* at 596 (emphasis added).

It is unnecessary for this court to consider whether a civil defendant's right to a unanimous verdict under the Seventh Amendment compels application of the same "any possibility" standard announced in *Brown*. Even applying this criminal standard, the record discloses that the one and only reason underlying Mr. Pirner's request to be dismissed was a serious medical condition, as verified by the opinion of his physician. From this medical ailment defendant attempts to construct a scenario that is "wholly consistent with Pirner being a holdout causing the jury to deadlock." Dkt. No. 494, at 70. The court believes that the only scenario these events are wholly consistent with is that Mr. Pirner, a man with a heart and nervous condition, had succumbed to the normal stresses of deliberation, as well as the added pressures of attempting to chair a group of nine individual, independent minds. In the court's view, it would have been unconscionable to subject Mr. Pirner to further deliberation at the risk of aggravating his existing precarious heart condition.

It is true that Mr. Pirner must have been one of the jurors causing a deadlock, insofar as he was one of the members of the jury. But it is impossible to divine from the record how this juror stood with respect to the evidence. It is equally "possi-

ble" that Mr. Pirner was persuaded by plaintiff's evidence, and that he was simply physically and emotionally unable to continue deliberating with a different "Texaco holdout" unsuspected by defendant. Defendant's theory is based on nothing more than a visceral hunch that Mr. Pirner was "for them," and that his dismissal resulted in the loss of a valuable defense ally.[22] Tr. Vol. 46, at 8661–62; *see Ellis v. Oklahoma*, 430 F.2d 1352, 1356 (10th Cir.1970) (surmise and suspicion may not be used to assail integrity of jury), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971). But even assuming the validity of this entirely speculative assumption, defendant's argument is premised on the notion that it has a constitutional right to at least one partisan on the jury, and that the unavoidable dismissal of its partisan solely for legitimate and necessary medical reasons deprived it of a hung jury. If this were the case, any losing party could always allege a Seventh Amendment violation from the dismissal of one of "their" jurors for medical or other legitimate reasons. Fortunately, a more earnest allegation of error is necessary before concerns of a constitutional magnitude are implicated. As the court held in *Anderson*, "[a] litigant has no vested right to keep a particular juror on the panel." 543 F.2d at 735.

Under Fed.R.Civ.P. 48, the parties may stipulate that a civil jury consist of less than 12 members, the only limitation on this being this district's local rule requiring at least 6 jury members. D.Kan. Rule 216. In this case, the parties had agreed to a unanimous verdict of all jurors able to continue in their jury service, and the court originally impanelled 10 jurors as a safeguard against the inevitable attrition to be expected during a trial of almost four months. During the course of trial, the

---

**22.** The court notes that another "possible" reason for defendant's conviction as to Mr. Pirner's sympathies may be found in an *ex parte* communication between Mr. Pirner and a lay person employed by defendant to sit as a "phantom juror" in the court gallery. Tr. Vol. 44, at 5157–77; *see Anderson*, 543 F.2d at 735 (upholding dismissal of juror who had a conversation with an employee of defendant). Of course, this mere possibility is as speculative as that now advanced by defendant, and it could no more form the basis of an allegation of error than defendant's present motion. As a result of this incident, this court has adopted the rule that the parties shall disclose the identity of observers in the courtroom and shall admonish such observers to refrain from communication with any juror.

court dismissed juror Skidmore for work reasons, which defendant does not challenge. After juror Pirner's dismissal for an even more compelling reason, eight members remained to continue deliberations. Thus, there is no merit to defendant's allegation that the dismissal of Mr. Pirner deprived Texaco of a unanimous verdict.

### H. Punitive Damage Evidence

Defendant also alleges error in the court's exclusion of evidence offered by Texaco to negate or mitigate the punitive damage award.

First, the court did not permit defendant to introduce evidence of Texaco's withdrawal of other products from the market, ostensibly out of safety concerns. Defendant contends that its actions at other times, concerning other products, is evidence of a company that places the public safety above its own economic concerns. Be that as it may, Texaco has been sued in this case only for its conduct with respect to the product benzene, and this conduct may not be established by using character evidence circumstantially for the purpose of proving action in conformity with that character on a particular occasion. Fed.R. Evid. 404(a). Moreover, even if Texaco's and Mr. Richards' general good character for acting in the public interest were admissible for this purpose, their character, which is not in issue in this case, could not be proven by specific instances of conduct. Fed.R.Evid. 405(b) (specific instances of conduct admissible only if character comprises an essential element of claim or defense). In upholding the exclusion of similar "good guy" evidence, the Kansas Supreme Court has poignantly observed: "A person who is ordinarily a philanthropist and humanitarian does not receive thereby a license to commit intentional wrongs on his days off." Tetuan, 241 Kan. at 484–85, 738 P.2d at 1240.

Second, defendant asserts that the court erroneously prevented it from introducing evidence of the amount of revenue generated by Texaco's benzene sales. Because benzene comprises only a small portion of Texaco's entire sales, defendant contends that this evidence would have provided the jury with a more appropriate measure by which to assess punitive damages. Under Kansas punitive damage standards, however, the amount of profit received as a result of intentional wrongdoing is not the ceiling of punitive damage liability. Tetuan, 241 Kan. at 491, 738 P.2d at 1245. To the contrary, if evidence of a defendant's financial status is introduced, the deterrent effect of punitive damages is served only by reference to the net wealth of the wrongdoer. Otherwise, a manufacturer could continue to "gamble" with low revenue, "high risk" products, secure in the knowledge that any future punitive liability could always be mitigated by a compartmentalization of profits. See id.

### I. Miscellaneous Rulings

Defendant also alleges error for compelling the attendance of Ron Richards, a Texaco employee, in plaintiff's case in chief, and for allowing plaintiff to add a witness not listed in the pretrial order. Although Mr. Richards resides more than 100 miles from this district, he is Texaco for purposes of this lawsuit, and thus a party to the action. The court does not believe that the limitation of Fed.R.Civ.P. 45(e) applies to this situation, particularly considering defendant's stated intention to call this key witness in any event. The court discerns no error in this ruling. Nor can the court agree that it was error to allow plaintiff to call Dr. Infante after the court had allowed defendant to add several witnesses itself. The court also granted defendant's motion to call Mr. Kwon as a rebuttal witness of Infante's testimony, and allowed Mr. Kwon to testify on each specific factual area deemed deserving of a rebuttal. Order filed November 21, 1989. Defendant declined to act upon the court's grant of its motion. The court finds this allegation of error to be meritless.

## V. Jury Instructions

### A. Presumption of Causation

Defendant first argues that instructing the jury according to the presumption of

causation from an inadequate warning was contrary to Kansas law.[23] As defendant correctly notes, state law governs any presumptions in this diversity action. Fed.R. Evid. 302.

In *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984), the court held:

> There is a presumption that an adequate warning would be heeded. This operates to the benefit of a manufacturer where adequate warnings are in fact given. Where warnings are inadequate, however, the presumption is in essence a presumption of causation.

*Wooderson*, at syl. ¶ 11 & 410, 681 P.2d at 1057; *see also Long v. Deere & Co.*, 238 Kan. 766, 778, 715 P.2d 1023, 1032–33 (1986) (manufacturer failed to defeat presumption notwithstanding contrary evidence on causation). Defendant neither cites nor responds to these cases, but instead raises two arguments to defeat application of the presumption to this case.

■■■ Defendant first contends that this presumption, if it exists at all, has no application to bulk sellers whose warning never reaches the ultimate consumer. Under the prescription drug rule adopted in *Wooderson*, however, the court was also confronted with a factual situation in which the warning was not intended for the ultimate consumer of the product. Thus, the facts of the very case adopting the presumption of causation in Kansas refute this argument.

Defendant's main argument focuses on a statutory construction that the court assumes is an invitation to "correct" the Kansas Supreme Court's decisions in *Wooderson* and *Long*. Specifically, defendant relies upon K.S.A. § 60–414, which provides in full:

> Subject to K.S.A. 60–416 [inconsistent presumptions], and except for presumptions which are conclusive or irrefutable under the rules of law from which they arise,
>
> (a) if the facts from which the presumption is derived have *any* probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is

---

**23.** Instruction No. 23 states:

If you find that Otis Mason's leukemia was caused by exposure to Texaco's benzene, you must also consider whether such exposure was caused, in whole or in part, by the nature of the warning given by Texaco, or to the contrary, was caused by the acts of parties other than Texaco.

In considering whether Texaco's warning caused Otis Mason's exposure to benzene, you are instructed that a manufacturer may presume that an adequate warning will be read. Thus, if you find that Texaco's warning was adequate, you must find that Texaco did not cause Otis Mason's exposure to its benzene and accordingly, you must return a verdict for Texaco.

On the other hand, where the manufacturer's warning is inadequate, there is a presumption that this inadequate warning caused exposure to the manufacturer's product. Accordingly, if you find that Texaco's warning was inadequate, you may presume that this warning caused, either in whole or in part, Otis Mason's exposure to benzene.

The presumption that an inadequate warning caused exposure to a dangerous product may be overcome, or defeated, by evidence showing that the subsequent acts or omissions of parties other than the manufacturer were the sole cause of this exposure, rather than the manufacturer's

inadequate warning, or may be overcome by any other evidence to the contrary. Thus, if you find that actions taken or not taken by parties in the chain of distribution or use of Texaco's benzene were the sole cause of Otis Mason's exposure to Texaco's benzene, then you must find that Texaco did not cause Otis Mason's exposure to its benzene.

In determining whether other parties were the sole cause of Otis Mason's exposure to Texaco's benzene, you are instructed as follows. A negligent act or omission by a party who acts after the first negligent actor is not the sole cause of an injury if the first negligent actor could foresee, or should have reasonably foreseen, the subsequent negligent acts or omissions by these other parties. Thus, if you find that Texaco's warning was inadequate, and that Texaco could foresee, or should have reasonably foreseen, the subsequent acts or omissions of other parties, then you must find that Texaco caused, either in whole or in part, Otis Mason's exposure to its benzene. On the other hand, if you find that Texaco's warning was inadequate, but that Texaco could not foresee, or should not have reasonably foreseen, the subsequent acts or omissions of other parties, then you must find that Texaco did not cause Otis Mason's exposure to its benzene.

upon the party against whom the presumption operates;

(b) if the facts from which the presumption arises have *no* probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced which would support a finding of the nonexistence of the presumed fact, and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved.

(emphases supplied). Defendant only cites to subsection (b) of this statute, arguing that any presumption of causation disappears if "evidence is introduced which would support a finding of the nonexistence of the presumed fact...." Defendant contends that it introduced such evidence through certain Coast Guard employees who testified as to what they would have done if they had received Texaco's MSDS or other information comparable to that in Texaco's MSDS.

■ This court must assume that the Kansas Supreme Court is familiar with Kansas statutory law, and that it does not fashion its holdings in derogation to the intent of the Kansas elected branches. Fortuitously, the court need not accept defendant's implicit invitation to reconsider the *Wooderson* decision for the Kansas Supreme Court, because it finds defendant's argument to be based upon the erroneous assumption that this presumption comes within subsection (b) of the statute. Under subsection (a), a presumption derived from evidence that itself has any probative value is not eliminated simply because some evidence contrary to the presumed fact is introduced. Kansas as well as federal law provides that evidence having any tendency in reason to establish a material fact has probative value. *Schmeck v. City of Shawnee*, 232 Kan. 11, 32, 651 P.2d 585 (1982); *State ex rel. Hausner v. Blackman*, 7 Kan.App.2d 693, 698, 648 P.2d 249 (1982), *aff'd*, 233 Kan. 223, 662 P.2d 1183 (1983); Fed.R.Evid. 401 & advisory committee's note. Thus, the court must conclude that the presumption of causation falls under subsection (a) of the statute if evidence of an inadequate warning

has any tendency to render the inference of causation "more probable than it would be without the evidence...." *Blackman*, 7 Kan.App.2d at 698, 648 P.2d 249.

The court finds that evidence of an inadequate warning easily meets the liberal test for probative value under the Kansas and federal rules. It must be borne in mind that evidence need not *establish* a fact, by any standard of proof, for it to have probative value. All that is required is that it have *any* tendency to make the existence of the fact more probable than it would be without the evidence. Fed.R.Evid. 401. And the clear language of K.S.A. § 60–414(a) directs that presumptions created by evidence having *any* probative value in establishing the presumed fact continue to exist notwithstanding the introduction of "some" contrary evidence. The facts of this case have a particularly compelling tendency to support an inference of causation from an inadequate warning, because each entity within the chain of distribution or use altered its conduct when it finally learned of benzene's carcinogenic propensities. Thus, the court concludes that instructing according to the presumption of causation from an adequate warning is a correct statement of Kansas law under both *Wooderson* and K.S.A. § 60–414(a).

**B. When the Duty to Warn Arises**

■ Instruction No. 10 stated in relevant part:

There is no duty to warn of every remote possibility of danger that could result from the use of a chemical product such as benzene. The labeling, written information, and/or any other method of communicating the warning should include a warning as soon as there is reasonable evidence of an *association* of a serious hazard with the product. The manufacturer must warn of those dangers which are reasonably foreseeable. Although a conclusive *causal* relationship need not have been proven, where scientific or medical evidence exists tending to show that a certain danger is *associated* with use of the chemical, the

manufacturer may not ignore or discount such information in making its warning solely because it finds it to be unconvincing.

(emphases supplied). Defendant challenges this instruction on the ground that the court erred in determining when the duty to warn arises. Defendant's expert Dr. Labarthe testified that the word "association" has a very specific meaning in epidemiology, and that an association between a given compound and a disease does not necessarily establish a cause and effect relationship. Thus, by not inserting the words "causal" and "causally" before the words "association" and "associated," respectively, defendant claims that the court's instruction is inconsistent with the testimony of Dr. Labarthe.

With respect to when the duty to warn arises, the Kansas Supreme Court held in *Wooderson*:

> [W]here scientific or medical evidence exists *tending to show* that a certain danger is *associated* with use of the drug, the manufacturer may not ignore or discount that information in drafting its warning *solely because it finds it to be unconvincing.*

235 Kan. at 417, 681 P.2d at 1062 (quoting *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 198, 423 N.E.2d 831 (1981)) (emphases added by Kansas Supreme Court). The *Wooderson* court also reemphasizes this holding in the court syllabus. *Id.* at syl. ¶ 10. To the extent there is any error to correct on this matter, the court believes that defendant's argument is addressed to the wrong forum. In Kansas, Texaco's duty to warn is defined by the pronouncements of the Kansas Supreme Court, and not by the hypertechnical, nuanced distinctions made by scientists who testify in lawsuits.

Assuming for the moment that it is improper to instruct according to Kansas law, two considerations mitigate the asserted error of the court's refusal to modify the words "association" and "associated" with defendant's preferred adjective and adverb. First, "it is well settled that the form of

jury instructions is a matter for the trial court's discretion, and the trial court need not give an instruction in the exact form and language requested." *United States v. Gomez–Olivas*, 897 F.2d 500, 502 (10th Cir.1990). If the court's instruction "as a whole adequately states the law, the refusal to give a particular requested instruction is not an abuse of discretion." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir.1990). The language of Instruction No. 10 makes clear that the relationship triggering the duty to warn is the technical *causal* association. Second, it taxes the imagination to believe that during a three month trial generating volumes of testimony on numerous issues, non-scientific minds such as those of a lay jury could possibly assimilate the various hues of the word "association" recognized by epidemiologists. The court is convinced that no danger of confusion existed by instructing according to the language of *Wooderson.*

## C. Manufacturer's Duty as an Expert

Defendant also takes issue with the standard of knowledge imposed upon the manufacturer under Instruction No. 10, which in relevant part informed the jury that "the manufacturer is deemed to have the knowledge of an expert in that field." Defendant complains that imputing such extraordinary knowledge to Texaco is inconsistent with the standard of a reasonable manufacturer under Kansas law.

Defendant fails to appreciate that as a matter of law, all reasonable manufacturers are deemed to have the knowledge of experts in their particular field. *Wooderson*, 235 Kan. at 409, 681 P.2d at 1057 & syl. ¶ 6; *see also Garst v. General Motors Corp.*, 207 Kan. 2, 21, 484 P.2d 47, 61 (1971) (several factors relevant in determining whether manufacturer has in fact exercised the care and skill of an expert). This "extraordinary" knowledge imputed to manufacturers is entirely consistent with the policies of strict liability recognized in Kansas.[24] *Davis v. Fox River Tractor Co.*,

---

24. Defendant has also argued that Kansas no

longer recognizes strict liability for failure to

518 F.2d 481, 484 n. 4 (10th Cir.1975) (§ 402A of the *Restatement (Second)* imposes a higher standard of conduct upon manufacturers than does common law negligence). Defendant's objection to this language is meritless.

### D. Punitive Damages

■ Defendant challenges the court's denial of its request for an instruction that punitive damages may be imposed only for conduct tantamount to fraud. In essence, defendant argues that because fraudulent conduct is sufficient to impose punitive damages under Kansas law, such conduct is also necessary.

The Kansas Supreme Court has consistently held that punitive damages may be awarded "whenever the elements of fraud, malice, gross negligence, *or* oppression mingle in the controversy." *Wooderson*, 235 Kan. 387, 681 P.2d 1038, syl. ¶ 16 (emphasis supplied). Such damages are awarded as punishment for the "malicious, vindictive, *or* willful and wanton invasion of another's rights...." *Tetuan*, 241 Kan. at 481, 738 P.2d at 1239 (emphasis supplied). Either willful or wanton conduct is sufficient to impose punitive damages, and no element of intentional wrongdoing is required for conduct to be "wanton." *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 72–75, 755 P.2d 1319, 1333–34

(1988). As affirmed by the Kansas Supreme Court in *Wooderson*, facts supporting an inference of gross negligence or reckless indifference to the rights of others are sufficient to submit the issue of punitive damages to the jury. 235 Kan. at 419, 681 P.2d at 1064. Defendant's reliance on those Kansas cases imposing punitive damages for fraudulent conduct is misplaced. To engraft this element of proof on all punitive damage claims would require the court to disregard as mere surplusage the numerous pronouncements by the Kansas Supreme Court on this subject.

■ Defendant also alleges error in the court's instructions regarding the burden of proof under which punitive damages may be awarded. Defendant asserts that Kansas law requires punitive liability to be proven by clear and convincing evidence, citing to *Mackey v. Burke*, 751 F.2d 322 (10th Cir.1984).

Although defendant has previously argued that Kansas requires proof of fraud before the jury can award punitive damages, the present objection is apparently being raised for the first time. Indeed, interrogatory number 7 of defendant's proposed verdict form requests a preponderance of the evidence standard for punitive liability. Dkt. No. 456. Assuming defendant had raised a timely objection to the court's instructions on this matter, the argument would fail on the merits. It comes

---

warn cases. In support, defendant calls attention to Kansas Supreme Court language emphasizing the standard of "reasonableness" under either negligence or strict liability. *See Mays v. Ciba–Geigy Corp*, 233 Kan. 38, 661 P.2d 348, syl. ¶ 6. (1983); *Johnson v. American Cyanamid Co.*, 239 Kan. 279, 286, 718 P.2d 1318 (1986) (plaintiff must show negligence on the part of the manufacturer in determining warning issues). By emphasizing the "reasonableness" or "negligence" of the manufacturer, however, the *Johnson* decision does no more than reaffirm that Kansas strict liability law is thoroughly infused with negligence concepts. *See Kennedy v. City of Sawyer*, 228 Kan. 439, 448–52, 618 P.2d 788 (1980) (comparative negligence principles are applicable to Kansas strict liability actions); *Albertson v. Volkswagenwerk Aktiengesellschaft*, 230 Kan. 368, 373, 634 P.2d 1127 (1981) ("strict liability in tort does have a fault basis, therefore subjecting it to comparison with other fault concepts"); *Wooderson*, 235 Kan. at 403–04, 681 P.2d at 1052 ("product which is faultlessly designed and manufactured may be nevertheless

unreasonably dangerous within the meaning of § 402A if not accompanied by proper warnings" and "[a]s a practical matter, this in determined by application of negligence theory") (quoting *Ortho Pharmaceutical v. Chapman*, 180 Ind.App. 33, 50–52, 388 N.E.2d 541 (1979)). Whatever conceptual difficulties may attend this approach, the Tenth Circuit has likewise recognized that the adequacy of a warning in Kansas is "'judged under a reasonableness standard—even if the claim is made under the rubric of a strict products liability defect.'" *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1411 (10th Cir. 1988) (quoting *Johnson v. American Cyanamid Co.*, 718 P.2d at 1324–25); *see also Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 455 (10th Cir.1982). Thus, there is no basis for the inference that Kansas has abandoned the cause of action of strict liability or its underlying policies as applied to claims of failure to warn. *But see Graham v. Wyeth Laboratories*, 666 F.Supp. 1483, 1499 (D.Kan.1987) (per Judge Kelly), *rev'd on other grounds*, 906 F.2d 1399 (10th Cir.1990).

as no surprise that the *Mackey* court reviewed the jury's award of punitive damages under a clear and convincing standard, because the punitive award in that breach of contract action was predicated on proof of intentionally deceptive or fraudulent activity. 751 F.2d at 328. As already noted, the Kansas Supreme Court has never required proof of fraud to justify an award of punitive damages for tortious conduct. In addition, the Kansas Supreme Court has not interpreted any of its decisions to have created a new burden of proof for punitive damages. In *Folks* the court took note of recent requests to legislatures and *courts* "to change the standards for awarding punitive damages," including the requirement of "a higher standard of proof, *i.e.*, clear and convincing." 243 Kan. at 72, 755 P.2d at 1332. Apparently, the *Folks* court considered it a given that as of 1988, the clear and convincing standard for punitive damages was nothing more than a proposal and awaited further legislative or court action.[25] Instructing the jury under the traditional preponderance of the evidence standard accurately stated Kansas law.

### E. Liability of Gerin

■ Defendant requested that the jury be specifically instructed to consider as an additional basis of fault Gerin's "affirmative representation" of compliance with ASTM 96.[26] *See supra* section III.C. This instruction appears to be the type of detailed "evidentiary instruction" that defendant elsewhere vigorously opposed. Nevertheless, the evidence of Gerin's alleged misrepresentation was before the jury, and its relevance to Gerin's proportionate fault was a matter appropriate for emphasis by counsel, not the court. *See Vanskike v. ACF Indus., Inc.*, 665 F.2d 188, 201–02 (8th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *National Business Lists, Inc. v. Dun & Bradstreet, Inc.*, 552 F.Supp. 99, 101 (N.D.Ill.1982). Moreover, the instruction as requested assumes liability regardless of any actual or constructive knowledge on the part of Gerin regarding benzene's carcinogenic properties, and would therefore have allowed the jury to find fault without reference to Gerin's legal duty. The court finds no error in refusing this instruction.

### F. *Allen* Instruction

■ Defendant also objects to giving an *Allen* instruction.[27] On the sixth day of deliberations, the jury sent a note to the

---

25. The court notes that the Kansas legislature has since responded by changing the burden of proof for punitive damages to the clear and convincing standard. Kan.Stat.Ann. §§ 60-3701(c), 60-3702(c) (Supp.1989). By the express terms of the statute, this change is effective only as to actions accruing on or after July 1, 1987. *Id.* at §§ 60-3701(i) & 60-3702(h).

26. Defendant's Proposed Instruction No. 25 read:

Evidence has been introduced that Gerin was selling benzene as a component of its oil water and sediment test. Evidence has also been admitted that the use of benzene as a solvent in this test was not in compliance with the standard test, ASTM96. The evidence further shows that at all times relevant to this lawsuit, Gerin affirmatively represented that the Gerin test kit complies with ASTM96. If, from the evidence, you find that the Coast Guard relied upon this representation, and as a result of that reliance Otis Mason contracted leukemia, you may consider this as an additional basis upon which you can find Gerin at fault.

(citing *Restatement (Second) of Torts* § 402B).

27. The instruction read:

It is apparent that after some 6 days of deliberation on this case, there must be some problem among the jury about agreement on the issues outlined in Instruction No. 6, which you are to follow.

You know from hearing the evidence that it is an old case—some 10 years since Otis Mason died and over 11 years since the case was filed. You also know there were prior proceedings that occurred some years ago. If you cannot decide this case, there will undoubtedly be a future trial before another judge and jury. Justice is thwarted by delay. You as jurors and I as judge have a duty under our oaths to these litigants and to the public to get this case decided by you—if at all possible.

The underlying reason for the jury system of fact finding—in accordance with the judge's instructions on the law of the case—is to see that a fair trial occurs, that truth is found, and that justice is done on the evidence. Now, you as jurors, and I as judge, are the bearers of this responsibility. Allow me again to emphasize your duties as jurors as set forth in several instructions.

court stating: "The jury has become locked on question # 2. We await your instruction." The court replied with a note of its own, asking "that the jury specify what

> If you were sitting as jurors in a criminal trial, the government as plaintiff would have the burden of proof to persuade you of a defendant's guilt by producing evidence demonstrating such guilt beyond a reasonable doubt. Since nothing can be proved to absolute certainty, the government in a criminal case would have to produce evidence upon which no juror would hesitate to act upon in the most serious of his or her own affairs, i.e., matters concerning life and death, harm to a family member, or a grave financial decision. This "beyond a reasonable doubt" standard is the highest burden of proof in jury cases.
>
> The next highest burden of proof occurs in civil jury cases where fraud is alleged against a defendant. In cases involving allegations of fraud, the law requires a plaintiff to prove his or her case by clear and convincing evidence. The clear and convincing evidence standard means that the evidence should be "clear" in the sense that it is certain, plain to the understanding, unambiguous, and "convincing" in the sense that it is so reasonable and persuasive as to cause the jury to believe it.
>
> Finally, the third and lowest burden of proof upon a party is by a preponderance of the evidence, as explained in Instruction No. 4. A preponderance of the evidence simply means more probably true than not true, or, as it is often stated, more likely so than not so. This is the only burden of proof in this case, and, unless otherwise stated in the instructions, the burden is on the plaintiff on all issues except on the issue of the comparative fault of other actors, in which case the burden is on the defendant. I emphasize that this burden is satisfied only by facts shown in evidence. Facts are not produced by the questions or statements of lawyers, but by testimony or written exhibits. The jury may reach an inference of a true fact from other facts which have been shown to be likely true—aided by a juror's common sense. However, as emphasized in Instruction No. 47, a juror's own personal experience cannot be substituted for common sense (common experience to mankind in general). Neither can a juror make a finding of fact based on his or her own subjective opinion or feeling. There must be probative evidence to support a finding of fact. No juror in a civil case is given license to decide the case based on *his or her own feeling* without basing it on evidence *in the record.*
>
> Prejudice or bias on the basis of a juror's personal experiences or subjective belief is NOT permitted. Every prospective juror was asked by the Court during the selection process whether he or she had that open and unprejudiced state of mind that he or she

[was] meant by the word 'locked,'" and also instructing the jury to specify any clarification of the evidence it might be requesting.[28] In turn, the jury responded:

> would want a juror to have if he or she were a party litigant in the case. Every one of you assured me and the lawyers on each side that you could be fair and unprejudiced toward either party. I hold you to this. If any among you are not judging the case on the evidence, you cannot be a fair juror.
>
> From my observation, the issues in this case can be decided on a preponderance of the evidence without difficulty by each juror concentrating on the evidence, weighing it, and judging the believability of the witnesses under the rules previously given you for judging credibility. Please concentrate on Instructions Nos. 48 and 49. I do not desire that any juror should surrender his or her conscientiously held convictions based on evidence in the record. On the other hand, each juror should perform his or her duty conscientiously and honestly, according to the law and the evidence, and although the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions in weighing the evidence, and not a mere acquiescence in the conclusions of his or her fellows, yet in order to bring your nine minds to a unanimous result you must examine the question submitted to you with candor and with a proper regard and deference to the opinion of each other.
>
> I'm of the opinion that this case cannot be tried better or more exhaustively than it has been on either side. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury would be selected, and there is no reason to suppose that the case will ever be submitted to a jury of men and women more intelligent, impartial, or competent than yourselves, or that clearer evidence will be produced by one side or the other. Please try very hard to reach a verdict. It can and, if at all possible, should be done. Although the decision ultimately rests with you, the jury, I suggest that you now retire again and continue to consider the evidence under the instructions the Court has provided.

(emphases in original).

28. Defendant also objected to the court asking the jury to clarify its first note without first consulting counsel. The court overruled this objection to an administrative direction from the court. *See Acree v. Minolta Corp.,* 748 F.2d 1382, 1384–86 & n. 2 (10th Cir.1984); *see also United States v. Wilburn,* 549 F.2d 734, 737–38 (10th Cir.1977) (harmless error under criminal rules to instruct deadlocked jury to continue deliberations without informing counsel).

"the word 'locked' was used in lieu of hung jury. Several members of the jury wishes [sic] to ask: 'why does question number 2 have to be 100% yes or no when question number 8 has a place for a percentage of blame.'"[29] At this point the court decided to give an *Allen* instruction and to respond to the jury's question. Defendant's counsel objected to any attempt at all to encourage further deliberation and specifically objected to the language in the supplemental instruction contrasting the burdens of proof for different types of cases. Defendant raises this same objection in the present motion and also asserts that the instruction was coercive and clearly communicated the court's leanings to the jury.

The court's scrutiny of the supplemental instruction has failed to discover the language alleged to have "driven" the jury to render a "record setting verdict" in this case. Nor did the jury, which deliberated for another week, apparently consider this an exhortation to march back out and promptly return a verdict for the plaintiff. The bulk of the instruction reminds the jury of its various duties already set forth in other instructions. Although defendant contends that the instruction minimized plaintiff's burden of proof, this language only restates what the jury had already been told. Moreover, the Tenth Circuit has specifically rejected the argument that an *Allen* instruction in a civil case is rendered coercive when the court simply reminds the jury of its task under the preponderance of the evidence standard, rather than the higher burden of beyond a reasonable doubt. *Reazin v. Blue Cross & Blue Shield of Kansas*, 899 F.2d 951, 978 (10th Cir.1990) (*Allen* instruction delivered on fourteenth day of deliberations), *cert. denied*, — U.S. ——, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). Contrary to the argument now raised by defendant, the court's statement that the issues in this case could be decided by a preponderance of the evidence is facially neutral; it expresses no opinion one way or the other as to *how* the evidence should preponderate. It might just as easily be said that the language "prejudices" plaintiff by re-emphasizing that the burden on most issues is upon plaintiff. The instruction also makes clear that no juror is to give up any conscientiously held convictions and leaves open the possibility of a hung jury. *See United States v. Dyba*, 554 F.2d 417, 420–21 (10th Cir.), *cert. denied*, 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *United States v. Hernandez–Garcia*, 901 F.2d 875, 876–77 (10th Cir.1990) (no plain error to tell jury that case would have to be decided by another jury, rather than leaving open possibility of settlement).

Overall, defendant's objection to the instruction appears to be based primarily on a *res ipsa loquitur* approach to allegations of prejudicial error: the jury found against defendant, therefore error must have occurred. The court believes that something more should be required than a general objection to *any* attempt to encourage further deliberation. This is particularly true in light of the jury's query regarding the difference between Interrogatories Nos. 2 and 8, which indicated that the jury was still struggling with the issues and had already begun to deliberate anew. *See United States v. Porter*, 881 F.2d 878, 889

---

**29.** Interrogatory No. 2 asked the jury: "Do you find by a preponderance of the evidence that the benzene produced by Texaco was a cause of Mason's leukemia?" Interrogatory No. 8 instructed the jury to apportion the fault among the various persons or parties. The court's response to this question read:

In response, the Court informs the jury that question # 2 on the verdict form addresses the initial issue of causation from benzene manufactured by Texaco. Under this question you must determine whether Otis Mason was exposed to benzene manufactured by Texaco, and if exposed, whether such exposure was a substantial factor in causing his leukemia.

Even if you should answer question # 2 in the affirmative, however, this does not answer the question of whether Texaco was at fault for causing such exposure. Nor does an affirmative answer to question # 2 answer whether and by what percentage other parties may be at fault for Otis Mason's leukemia. Question # 8 addresses the issue of the comparative fault of other parties. Under this question, you must determine the relative fault, if any, of the various parties listed in Instruction No. 31. As explained in the instructions, fault cannot exist without first establishing causation of injury.

(10th Cir.) (where indication that jury was not hopelessly deadlocked, *Allen* instruction emphasizing importance of reaching a verdict not coercive), *cert. denied,* —— U.S. ——, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). In a case of this length, and in the second trial of an already protracted lawsuit, the court would consider it an abdication of its judicial duty to declare a mistrial unreservedly without at least some suggestion that the jury reconsider its deadlock. *See United States v. Winn,* 411 F.2d 415, 416 (10th Cir.) (distinguishing between coerciveness and judge's "common law right and duty to guide and assist the jury toward a fair and impartial verdict"), *cert. denied,* 396 U.S. 919, 90 S.Ct. 245, 24 L.Ed.2d 198 (1969). As the court stated in *United States v. Smith,* 857 F.2d 682 (10th Cir. 1988):

> The purpose of [an *Allen* ] charge is to encourage unanimity (without infringement upon the conscientious views of each individual juror) by urging each juror to review and reconsider the evidence in the light of the views expressed by other jurors, in a manner evincing a conscientious search for truth rather than a dogged determination to have one's own way in the outcome of the deliberative process. In short, the substance of the *Allen* charge is the salutary admonition of Oliver Cromwell: "I beseech you in the bowles [bowels] of Christ, think it possible you may be mistaken."

857 F.2d at 683–84. In the court's view, its instruction did no more than fulfill this laudable purpose.

## VI. *Misconduct*

Defendant also alleges several instances of misconduct both on the part of the court and plaintiff's counsel that prejudiced its case.

■■■ Defendant contends that the court "audibly" commented on the credibility of the defendant's witnesses during bench conferences. Throughout the trial, the side bar "huddles" took place not at the bench, but at the end of the bench on the opposite side of the courtroom from the jury. Between the approximately 50 feet separating this end of the bench from the jury box

stands the elevated section of the court clerk's station, which further dampens any sound that might escape side bar conferences.

This description of the topographical conditions of the courtroom places defendant's current allegations in the proper perspective. Undoubtedly, an alert and curious juror may have been able to seize upon the occasional word, although the court cannot imagine why the jury would not welcome these brief, merciful respites from the often tedious testimony by discussing more mundane matters among themselves. And it is equally true that at times all persons at side bar, including defendant's counsel, may have spoken louder than intended. *E.g.,* Tr. Vol. 11, at 987; Tr. Vol. 46, at 5410. The court often admonished the parties to lower their voices, and when necessary the jury was dismissed to allow for further uninhibited argument. As to the single instance of allegedly audible comment by the court, the record is devoid of any indication whether fans were running at the time of this side bar conference, which would render almost infinitesimal the likelihood of the jury having heard anything. Moreover, the cited instance is unaccompanied by any contemporaneous request or objection in the record. The court is likewise unable to discern from the affidavit of Mr. Wiechmann, counsel for defendant, what he heard and when by sitting in the back of the courtroom. Because Mr. Wiechmann normally sat at the defense table, a suspicious mind might infer that the purpose of those occasions on which he sat in the court gallery was to create a record, rather than to assist the court in taking any necessary corrective action. Indeed, if this problem had been of such genuine concern to counsel during the trial, it is reasonable to assume that defendant would have proposed an alternative method of conducting side bar conferences, such as *retiring to chambers or even dismissing the* jury. Defendant's counsel are familiar practitioners in this court and are surely aware that this court is easily approachable and always open to suggestion on such matters. In conclusion, the court finds

that defendant's allegation of error is based on sheer speculation. It is therefore unnecessary to consider what harmful effect this might have had on the substantial rights of defendant. Fed.R.Civ.P. 61. *See Kloepfer*, 898 F.2d at 1461 (no reversible error for allegation that counsel raised his voice within jury's earshot during sensitive discussion); *United States v. Mobile Materials Inc.*, 881 F.2d 866, 877 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990).

Defendant calls attention to several statements made by plaintiff's counsel during closing argument said to constitute prejudicial misconduct. Trial misconduct must be particularly egregious to require retrial, and the trial court retains broad discretion in making this determination. *Polson v. Davis*, 895 F.2d 705, 711 (10th Cir.1990); *Kloepfer*, 898 F.2d at 1461. Although an argument may be improper, "the judgment should not be disturbed unless it clearly appears that the remarks in question unduly aroused the sympathy of the jury and thereby influenced the verdict." *Texas Eastern Transmission v. Marine Office*, 579 F.2d 561, 567 (10th Cir.1978); *see also Smith v. Atlantic Richfield Co.*, 814 F.2d 1481, 1488 (10th Cir.1987).

▇▇▇ While holding up a life expectancy chart, plaintiff's counsel briefly suggested that Otis Mason's projected life expectancy could relate to the jury's assessment of a monetary value for pain and suffering. Because compensation for pain and suffering obviously presupposes that the person was alive and thus able to experience pain, the court is unable to perceive how this single non sequitur could have influenced the jury's award for this item. Plaintiff's counsel also suggested that the jury could valuate Otis Mason's pain and suffering by reference to Texaco's profits during the period of his illness. The court agrees with defendant and concludes that an accurate reading of Kansas law does not allow a defendant's financial condition to enter into the jury's consideration of compensatory damages for items such as pain and suffering. *See Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir.1977).

As already noted, however, the court instructed the jury that the only purpose for which it could consider defendant's financial worth was in assessing punitive damages. *See supra*, section IV.A. Further, the jury was specifically instructed to disregard anything said by counsel at variance with the court's instructions. Instruction No. 49. Thus, considering this comment within the entire context of the trial and closing argument, it does not clearly appear that this could have possibly prejudiced defendant.

Finally, defendant alleges an instance of improper argument for counsel's statement that Texaco caused Otis Mason to die, and "that other people were and still are dying. . . . because Texaco doesn't tell the people they sell it to so they can pass it on to you. . . ." Tr. Vol. 62, at 8499. The argument of counsel was an entirely permissible inference from the evidence, and the court finds no error in this statement. Taken as a whole, the statements of counsel during closing argument are more appropriately characterized as zealous advocacy rather than prejudicial conduct. *Squyres v. Hilliary*, 599 F.2d 918, 923 (10th Cir.1979).

## VII. *Damages*

Finally, defendant challenges as excessive both the actual and punitive damages awarded. Additionally, defendant asserts that the jury's punitive award violates the due process clause of the Fourteenth Amendment.

### A. Compensatory Damages

▇▇▇ The actual damages in this case were awarded under plaintiff's survival action and wrongful death claim. The Kansas survival action allows recovery of damages for the pain, suffering, disability and any accompanying mental anguish suffered by the decedent before death, as well as for reasonable medical expenses provided both professionally and gratuitously by relatives. *See, e.g., St. Clair v. Denny*, 245 Kan. 414, 421, 781 P.2d 1043 (1989). Under plaintiff's wrongful death claim, damages were awarded for the survivors' bereave-

ment and mental anguish, loss of services, attention, marital and parental care and protection, and for loss of future earnings. As with all of its functions as trier of fact, the jury has wide discretion in determining the amount of damages that will fairly compensate the aggrieved party. *Black v. Hieb's Enterprises, Inc.*, 805 F.2d 360, 362–63 (10th Cir.1986); *see also Menne v. Celotex Corp.*, 861 F.2d 1453, 1474 (10th Cir.1988) (plaintiff is not bound by the amount of relief requested in the complaint but only by the evidence adduced at trial). The court reviews the amount of damages awarded by the jury under the standards set forth in *Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152 (10th Cir.1981) (en banc) (plurality opinion), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983):

> [A]bsent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate. Such bias, prejudice or passion can be inferred from excessiveness. However, a verdict will not be set aside on this basis unless it is so plainly excessive as to suggest that it was the product of such passion or prejudice on the part of the jury.

*Id.* at 1168 (citations and footnote omitted). ▪ The court has reviewed the jury's award of $4,000,000 for Otis Mason's personal injuries and $5,025,000 for plaintiff's wrongful death claim and finds these to be reasonable amounts, supported by the evidence and uninfluenced by either passion or prejudice. Although defendant attempts to minimize the degree of physical and mental pain and suffering experienced by Mason, the court finds this argument to be unconvincing. After the initial diagnosis, which itself involved a number of painful bone marrow tests, Mason began a series of excruciating chemotherapy treatments. These treatments successfully induced a period of remission, during which time Mason nonetheless experienced internal bleeding and was required to undergo continuous maintenance treatment. Mason was also aware that the period of remission would be only temporary, and that his only hope for survival was that a cure would be found in time. Once out of remission, Mason again underwent chemotherapy and was aware that he would die. Both Mason and his wife also saw a psychiatrist at this time to help them with the mental anguish caused by his considerable suffering and impending death.

Bearing in mind that much of the jury's compensatory award is based on intangible items such as pain and suffering, the court will not disturb the jury's findings on this issue. *See Fudge v. City of Kansas City*, 239 Kan. 369, 380, 720 P.2d 1093 (1986). The court's conclusion is further strengthened by the fact that this is the second time a jury has determined actual damages in the amount of some $9,000,000. Even if the court were to disagree with this jury's assessment, the court would hesitate to disturb a finding that two juries, deliberating independently, have now made.

### B. Punitive Damages

Defendant challenges any award of punitive damages as unwarranted under the evidence. Alternatively, defendant contends that the amount awarded is the result of passion and prejudice, and is violative of the Fourteenth Amendment's due process clause.

In a diversity action, the court must consider the propriety of a punitive damage award with reference to those factors under which state law deems such an award appropriate. *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). However, whether to order a new trial or grant a remittitur based upon an insufficiency of evidence or excessive damages is a procedural matter governed by federal law. *Id.; England v. Gulf & Western Mfg. Co.*, 728 F.2d 1026, 1029 (8th Cir.1984). Where the only error is in the excessiveness of an award that itself is not the result of passion or prejudice, the court may order a remittitur. *Malandris*, 703 F.2d at 1168; *K–B Trucking Co. v. Riss Int'l Corp.*, 763

F.2d 1148, 1162 (10th Cir.1985). The decision of whether to grant a remittitur rests within the broad discretion of the trial court. *Garrick v. City and County of Denver,* 652 F.2d 969, 971 (10th Cir.1981). *Malandris,* 703 F.2d at 1184 n. 1 (Seymour, J., concurring and dissenting).

■ The court is also mindful that under Kansas law, "[w]hether to award punitive damages and in what amount is for the jury to determine." *Folks v. Kansas Power & Light Co.,* 243 Kan. 57, 76, 755 P.2d 1319, 1335 (1988). The standards governing punitive damages in Kansas are set forth in *Tetuan v. A.H. Robbins Co.,* 241 Kan. 441, 738 P.2d 1210 (1987):

> Punitive damages may be awarded whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. Punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to "restrain and deter others from the commission of like wrongs."

241 Kan. at 481, 738 P.2d at 1239 (citations omitted).

■ In this case, there can be no doubt that Texaco was actually aware of the substantial body of scientific literature indicating the carcinogenic danger of benzene. Ron Richards, the epidemiologist responsible for drafting Texaco's warnings, candidly admitted that he had read and was aware of many of these studies and reports. This fact alone was sufficient to create a jury question whether Texaco had acted wilfully, wantonly, or with gross negligence by failing to warn of the danger. In defense of Texaco's decision not to include this danger in its warning, Mr. Richards also adopted inherently inconsistent positions. On the one hand, Mr. Richards repeatedly stated his belief that the scientific studies did not indicate the carcinogenic danger of benzene "to a reasonable degree of certainty." On the other hand, this witness testified that Texaco chose the language "damage to blood forming organs" because this more comprehensive term was superior to the language "cancer hazard."

In other words, Texaco did not believe that the literature indicated a reasonably certain association between benzene exposure and leukemia, yet Texaco chose the language "damage to blood forming organs" because this "more accurate term" included other blood diseases besides leukemia. From these factually irreconcilable positions the court believes the jury could reasonably infer that Texaco's warning was designed to conceal, rather than inform of the carcinogenic danger posed by its product.

Defendant attempts to defeat the jury's finding of punitive liability by contrasting the facts of this case with those of two recent Kansas cases. In *Tetuan v. A.H. Robbins Co.,* 241 Kan. 441, 738 P.2d 1210 (1987), direct documentary evidence established a course of deceptive conduct intended to mislead the users of the manufacturer's product. With this argument defendant implies that willful, wanton, or malicious conduct may only be established when, as in the case of the A.H. Robins Company, the manufacturer obligingly leaves a paper trail documenting its misdeeds. The court does not believe that a manufacturer's punitive liability may only be based on a resolution adopted by its board of directors any more than the law requires direct evidence to establish the state of mind of criminal defendants. To the contrary, Kansas law allows for punitive damages if the evidence shows "that the actor *must be deemed* to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not." *Folks,* 243 Kan. at 72, 755 P.2d at 1332 (quoting *Cope v. Kansas Power & Light Co.,* 192 Kan. 755, 761, 391 P.2d 107 (1964)) (quoting *Frazier v. Cities Serv. Oil Co.,* 159 Kan. 655, 157 P.2d 822 (1945)) (emphasis added by *Folks* court).

Defendant also attempts to distinguish this case from the facts of *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 681 P.2d 1038, *cert. denied,* 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984), in which the manufacturer played down reports that it did not consider convincing

until it "could be entirely satisfied that the product was causing damage." *Id.* at 419, 681 P.2d at 1063. In *Folks*, the Kansas Supreme Court succinctly reviewed the evidence justifying punitive liability in *Wooderson*:

> [T]he defendant [in *Wooderson*] ignored scientific and medical evidence that use of its product caused serious damage. [Defendant] continued to use the product, played down its harm, and gave physicians no warning of the dangers involved.

243 Kan. at 78, 755 P.2d at 1336. This analysis could apply almost verbatim to the actions of Texaco in this case. Texaco ignored scientific and medical evidence linking benzene exposure to leukemia, finding this evidence "reasonably certain" only when OSHA issued its emergency temporary standard in 1977.[30] Texaco further played down the carcinogenic dangers of benzene exposure by couching this danger in language incomprehensible to virtually everyone. Like the defendants in *Wooderson* and *Tetuan*, the jury in this case could reasonably find that Texaco "knowingly embarked upon a course of conduct dangerous to the public, motivated by private gain." *Folks*, 243 Kan. at 79, 755 P.2d at 1337.

Defendant next contends that the size of the punitive award in this case is so excessive as to warrant the inference that it is the result of passion and prejudice. In reviewing a jury's punitive damage award, the relevant factors under Kansas law include:

> the actual damages sustained, the actual damage award, the circumstances of the case (the nature, extent, and enormity of the wrong), the intent of the party committing it, the relative positions of the plaintiff and the defendant, the defendant's financial worth and the plaintiff's probable litigation expenses.

*Folks*, 243 Kan. at 78, 755 P.2d at 1336. The jury determined actual damages in the amount of $9,025,000. Thus, the punitive award exceeds actual damages by less than 3 to 1. Although excessiveness is not determined by any fixed ratio of actual to punitive damages, the Kansas Supreme Court has affirmed punitive damage awards in which the ratio is as high as 30 to 1, and even more recently in which the punitive award exceeded actual damage by 10 to 1. *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743 (1983); *State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 747 P.2d 1326 (1987). In this case, the enormity of the wrong is revealed by the nature of the potential injury as well as the number of persons who were endangered by Texaco's conduct. Because the specific danger posed by benzene in this case is the development of an invariably fatal cancerous disease, the extent of the harm done to the particular individual is obvious. Moreover, the conduct of Texaco in this case was not directed toward any specific individual. By introducing its defective product into the stream of commerce, Texaco risked injury to anyone in the general population who happened to be exposed to its benzene. With respect to Texaco's intent in marketing benzene without sharing its information with its purchasers, there was sufficient evidence from which a jury could also infer profit motivated conduct. And as already discussed, the relative positions of Texaco to Mellen, a company of some 13 employees, as well as to others in the distribution chain, was one of nearly complete dependance upon the manufacturer to supply them with the information that only Texaco actually possessed.

Finally, plaintiff introduced evidence establishing Texaco's net worth to be $8,105,000,000. After taxes, Texaco's annual net earnings total some $1,304,000,000. The jury's award of $25,000,000 in punitive damages therefore represents 0.31% of Texaco's net worth and 1.92% of its annual net earnings after taxes. In a recent survey of punitive damage awards from sever-

---

**30.** Although the point was disputed at trial, there was testimony that Texaco was required by law to warn its customers of the 1977 emergency standard issued by OSHA. Moreover, even though Texaco did send its customers the 1977 OSHA standard, defendant continued to dispute the necessity of this standard in its private communications and advocated its repeal. *See supra* section IV.F.

al jurisdictions, the Seventh Circuit found a typical ratio for such damages to a defendant's net worth to be around one percent. *Cash v. Beltmann N. Am. Co.*, 900 F.2d 109, 111 n. 3 (7th Cir.1990). The court agrees with defendant that 25 million dollars is indeed a staggering sum. Yet the court must also consider this award in light of the underlying punishment and deterrent purposes of punitive damages. This purpose would be ill served if large manufacturers of chemical products, whose conduct recklessly and wantonly exposes the public to grave danger, could mitigate their punitive liability simply by urging a comparison with the amount that other juries have determined was necessary to punish and deter the conduct of other defendants with other financial conditions. The manufacturer in this case is one of the largest corporations in the world, and it is difficult if not impossible to determine what amount is sufficient and necessary to deter it and others from engaging in similar conduct in the future. *See Iola State Bank v. Bolan*, 235 Kan. 175, 193, 679 P.2d 720 (1984). The court's review of the jury's award is further informed by the type of conduct that the punitive award in this case is meant to punish and deter. This is a warning case in which it was alleged and proven to a jury that Texaco, notwithstanding its actual knowledge of the carcinogenic danger of benzene, chose not to inform its customers until "persuaded" to the contrary by governmental agencies. Providing an adequate warning of dangers for which there is reasonable, although not conclusive, scientific evidence is an inexpensive method by which the manufacturer can allow the purchaser or user to make an informed decision whether to expose himself or others relying upon him to this potential danger. *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1089 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Johns–Manville Sales Corp. v. Janssens*, 463 So.2d 242, 251 (Fla.Dist.Ct.App.1984), *review denied*, 467 So.2d 999 (Fla.1985); *Ragsdale Bros., Inc. v. Magro*, 693 S.W.2d 530, 536 (Tex.Ct.App.1985), *rev'd on other grounds*, 721 S.W.2d 832 (Tex.1986). By

reserving this information for itself, and unreasonably expecting unspecialized distributors or users to discover this danger through their own devices, Texaco deprived its customers of this choice. Considering all the evidence in light of the relevant factors, and giving the due deference required under Kansas law and the Seventh Amendment to the jury's determination of the amount necessary to punish and deter defendant and other manufacturers from such conduct in the future, the punitive award is not so excessive as to shock this court's judicial conscience. Thus, the court rejects defendant's contention that the punitive damage award was motivated by passion, prejudice or bias.

 As a further indicium of alleged passion and prejudice, defendant also draws the court's attention to the conduct of some of the jurors after the verdict was announced. As the jurors left the courtroom, Mrs. Mason and her children stood by the plaintiff's table to thank the jurors, as is permitted in this court. Mrs. Mason and some of the jurors briefly embraced one another, and it is alleged that these jurors had tears in their eyes. It is unclear from the affidavits filed by defendant's counsel whether the jurors or Mrs. Mason initiated this emotional contact, and the court took no particular notice of this event.

Defendant raises an argument of first impression in this court's 23 years of observing successful litigants expressing gratitude to jurors leaving the courtroom. Mrs. Mason has lived with this case and the death of her husband for over 11 years. After hearing the evidence over the course of three months, the jurors deliberated for two more weeks in a climate that was perhaps stressful at times. The entire ordeal for both the litigants and the jurors was undoubtedly a grueling and emotional ordeal, and if Mrs. Mason was crying when she hugged a juror, the court can well imagine that this might elicit a like response from the juror. The court cannot infer with the same confidence as defendant that this modest expression of emotion was the result of passion and preju-

dice, as opposed to a natural response to evidence indicating that plaintiff had been seriously aggrieved by defendant's wrongful conduct. As the Tenth Circuit has noted for cases involving claims of outrageous conduct:

> [I]t is not a jury's duty to set aside, even if it were possible, "all the decencies of human emotion when called upon to decide controversy," although it is their duty "not to allow emotion to overcome fact, not to allow sympathy to overcome reason, not to allow desire for result to overcome justice."

*Malandris,* 703 F.2d at 1168–69 (quoting *Barnes v. Smith,* 305 F.2d 226, 229 (10th Cir.1962)). In the court's view, the jury performed this difficult balancing act admirably. Finding nothing in the verdict or otherwise to indicate improper motivations in rendering a verdict supported by the evidence, the court will not disturb the damage awards.

C. Due Process Violation

Finally, defendant contends that the punitive damage award violates the due process clause of the Fourteenth Amendment. Specifically, defendant alleges that the jury imposed punitive damages with only vague and inadequate guidance from the court's instructions. Because defendant concedes that the court's punitive damage instructions were generally consistent with the statements of the Kansas Supreme Court,[31] (Dkt. No. 494, at 14), the court takes this as a challenge to the constitutionality of the punitive damage standards under Kansas law. Defendant supports its argument by referring the court to concurring opinions from two recent United States Supreme Court cases indicating a future willingness to review state punitive damage standards under a due process challenge. *Bankers*

*Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 87–88, 108 S.Ct. 1645, 1655–1656, 100 L.Ed.2d 62 (1988) (O'Connor, J., concurring in part); *Browning–Ferris Indus. of Vermont v. Kelco Disposal, Inc.,* — U.S. ——, 109 S.Ct. 2909, 2923, 106 L.Ed.2d 219 (1989) (Brennan, J., concurring).

The court doubts whether the detailed punitive damages standards in Kansas suffer from the constitutional infirmity suggested by the concurrence in *Crenshaw* and *Browning–Ferris.* See *Germanio v. Goodyear Tire & Rubber Co.,* 732 F.Supp. 1297 (D.N.J.1990) (punitive damages imposed under detailed jury instructions did not violate due process even though state law imposed no ceiling nor required any relation to compensatory damages). In any event, the court finds it unnecessary to consider this argument on the merits. Two trials and two opportunities to raise this argument have come and gone, but only now has defendant's objection to this instruction become specific. *See Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1295–96 (7th Cir.1987) (defendant's failure to object to punitive damage instruction on grounds that it did not provide jury with any guidance establishes this instruction as law of the case). Therefore, the court will not address an allegation of error that it had no opportunity to correct prior to the jury's deliberations. *E.g., Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1514 (10th Cir. 1984), *aff'd on other grounds,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).[32]

VIII. *Conclusion*

In any trial, and particularly a trial of almost four months that occupies well over

---

**31.** *But see* section V.D.

**32.** The Tenth Circuit apparently allows consideration of such due process challenges even if no timely objection was made at the proper stage of trial to the state punitive damage standards. *Malandris,* 703 F.2d at 1173; *cf. Crenshaw,* 108 S.Ct. at 1651 (Court would not pass on constitutional challenges to punitive damages not raised below). The *Malandris* decision provides no guidance as to when such a review

is appropriate, and the court therefore assumes it is a matter of discretion. Given the possibility of an impending pronouncement on this issue from the United States Supreme Court, *Pacific Mutual Life Ins. Co. v. Haslip,* 553 So.2d 537 (Ala.1989), *cert. granted,* — U.S. ——, 110 S.Ct. 1780, 108 L.Ed.2d 782 (1990), as well as defendant's failure to raise a timely objection before the jury retired, the court elects not to address this issue.

sixty volumes of printed transcript,[33] perfection cannot be guaranteed. But neither defendant nor any other litigant is entitled to a perfect trial—only to one that is fair. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984); *United States v. Mobile Materials, Inc.,* 881 F.2d 866, 877 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). The court has given thorough consideration to each of defendant's well-briefed arguments and has even changed previous rulings on critical issues to defendant's favor. The ultimate decisions in this case, however, were matters for the jury, not the court, to determine. The court will not disturb the jury's judgment, which finds substantial support under both the evidence and applicable law.

IT IS BY THE COURT THEREFORE ORDERED that defendant's motion for judgment notwithstanding the verdict, or alternatively for a new trial (Dkt. No. 494) be denied.

---

**33.** According to the court clerk's records for the two trials, the amount of trial time spent in this case now totals some 93 days or 468 hours.